[PHILADELPHIA, MARCH 29, 1833.]

GIRARD *against* The Mayor, Aldermen and Citizens of PHIL-
ADELPHIA.

VIDAL and Wife *against* the Same.

#### CASE STATED.

Real estate, acquired after the making of a will, does not pass under a devise of the residue of the testator's real estate, without a subsequent republication of the will, even where the testator, in addition to the general devise of the residue, declares in a codicil, that it is his wish and intention that all the real estate which he shall *thereafter* purchase, shall pass by the said will.*

THESE were amicable actions of ejectment, instituted to try the title of the defendants, who were the residuary devisees of the late *Stephen Girard,* to certain real estate, situate in the city and county of *Philadelphia,* described as follows, in the agreement under which the actions were entered:

" Two houses and lots on *Walnut* street, between *Second* and *Dock* streets, Nos. 63 and 65, and one house and lot on *Dock* street, No. 61, purchased *October* 5, 1831, by the late *Stephen Girard.*

" A lot of land in *Passyunk* township, containing sixty acres and eighty-seven perches, purchased by the same, *October* 27, 1831.

" A house and lot on the north side of *Coates'* street, west of *Sixth* street, purchased by the same, *October* 27, 1831.

" A lot of ground on the north-east corner of *Coates'* and *John* streets, purchased by the same, *November* 2, 1831.

" A house and lot in South *Third* street, No. 48, purchased by the same, *November* 4, 1831.

" A messuage and lot of ground in *Passyunk* township, having a front on *Schuylkill,* purchased by the same, *December* 1, 1831.

" Stores, wharf and dock in North *Water* street, between *Market* and *Arch* streets, late *Stiles'* estate, purchased by the same, *December* 21, 1831."

The following case was stated for the opinion of the court, to be considered as a special verdict:

" *Stephen Girard,* Esquire, late of the city of *Philadelphia,* banker, died on the 26th day of *December,* 1831—seized in fee of all and singular the real estate set forth in the agreement to enter the above action, purchased by him at the dates mentioned in the said agreement—having first made and executed his last will and testament, dated the 16th day of *February,* 1830, and codicils thereto, dated

---

* The law on this subject is altered by the following section of the Revised Act " Relating to last wills and testaments," passed *April* 8th, 1833, (*Pam. L.* 250):
" Sec. 10.    That real estate acquired by a testator after making his will, shall pass by a general devise, unless a contrary intention be manifest on the face of the will." REPORTER.

respectively on the 25th day of *December*, 1830, and the 20th day of *June*, 1831, duly proved in the Register's Office for the City and County of *Philadelphia*, on the 31st day of *December*, 1831, [prout will and codicils, which are to be considered as part of this case] and leaving at the time of his death, the following named heirs at law:

" 1. *Etienne Girard,* a brother of the testator of the whole blood.

" 2. *Antoinetta Hemphill,* wife of *John Hemphill, Henrietta Clark,* wife of *John Y. Clark,* and *Caroline Haslam,* wife of *John B. Haslam ;* the said *Antoinetta, Henrietta* and *Caroline,* being the children of *John Girard,* deceased, a brother of the testator of the whole blood.

" *Françoise Fenellon Vidal,* the wife of *Louis Vidal;* the said *Françoise Fenellon* being the daughter of *Sophia Girard Capayron,* deceased, a sister of the testator of the whole blood."

The following parts of the will only, are material:

" IX. I give and devise my house and lot of ground thereto belonging, situate in *rue Ramouet aux Chartrons,* near the city of *Bordeaux,* in *France,* and the rents, issues, and profits thereof, to my brother, *Etienne Girard,* and my niece *Victoire Fenellon*; (daughter of my late sister *Sophia Girard Capayron,*) (both residing in *France,*) in equal moieties for the life of my said brother, and, on his decease, one moiety of the said house and lot to my said neice *Victoire,* and her heirs forever, and the other moiety to the six children of my said brother, namely, *John Fabricius, Marguerite, Ann Henriette, Jean August, Marie,* and *Madelaine Henriette,* share and share alike, (the issue of any deceased child, if more than one, to take amongst them the parent's share) and their heirs forever.

" X. I give and bequeath to my said brother, *Etienne Girard,* the sum of five thousand dollars, and the like sum of five thousand dollars to each of his six children above named: if any of the said children shall die prior to the receipt of his or her legacy of five thousand dollars, the said sum shall be paid, and I give and bequeath the same to any issue of such deceased child, if more than one, share and share alike.

" XI. I give and bequeath to my said neice, *Victoire Fenellon,* the sum of five thousand dollars.

" XII. I give and bequeath absolutely to my neice, *Antoinetta,* now married to Mr. *Hemphill,* the sum of ten thousand dollars, and I also give and bequeath to her the sum of fifty thousand dollars, to be paid over to a trustee or trustees to be appointed by my executors, which trustee or trustees shall place and continue the said sum of fifty thousand dollars upon good security, and pay the interest and dividends thereof as they shall from time to time accrue, to my said neice for her separate use, during the term of her life, and from and immediately after her decease, to pay and distribute the capital to and among such of her children and the issue of deceased children, and in such parts and shares as she the said *Antoinetta,* by any instrument under her hand and seal, executed in the presence of at least

two credible witnesses, shall direct and appoint, and for default of such appointment, then to and among the said children and issue of deceased children in equal shares, such issue of deceased children, if more than one, to take only the share which their deceased parent would have taken if living.

"XIII. I give and bequeath unto my neice, *Carolina,* now married to Mr. *Haslam,* the sum of ten thousand dollars, to be paid over to a trustee or trustees to be appointed by my executors, which trustee or trustees shall place and continue the said money upon good security, and pay the interest and dividends thereof from time to time as they shall accrue, to my said neice, for her separate use, during the term of her life ; and from and immediately after her decease, to pay and distribute the capital to and among such of her children and issue of deceased children, and in such parts and shares, as she the said *Carolina,* by any instrument under her hand and seal, executed in the presence of at least two credible witnesses, shall direct and appoint, and for default of such appointment, then to and among the said children, and issue of deceased children, in equal shares, such issue of deceased children, if more than one, to take only the share which the deceased parent would have taken if living; but if my said neice, *Carolina,* shall leave no issue, then the said trustee or trustees, on her decease, shall pay the said capital and any interest accrued thereon, to and among *Caroline Lallemand,* (niece of the said *Carolina,*) and the children of the aforesaid *Antoinetta Hemphill,* share and share alike.

"XIV. I give and bequeath to my neice *Henrietta,* now married to Dr. *Clark,* the sum of ten thousand dollars; and I give and bequeath to her daughter *Caroline,* (in the last clause above named,) the sum of twenty thousand dollars,—the interest of the said sum of twenty thousand dollars, or so much thereof as may be necessary, to be applied to the maintenance and education of the said *Caroline* during her minority, and the principal, with any accumulated interest, to be paid to the said *Caroline,* on her arrival at the age of twenty-one years."

" The testator then gave the residue of his estate, to " the Mayor, Aldermen and Citizens of *Philadelphia,*" in the manner set forth in the following clause of his will :

" XX. And whereas, I have been for a long time impressed with the importance of educating the poor, and of placing them by the early cultivation of their minds and the developement of their moral principles, above the many temptations to which, through poverty and ignorance, they are exposed ; and I am particularly desirous to provide for such a number of poor male white orphan children, as can be trained in one institution, a better education, as well as a more comfortable maintenance than they usually receive from the application of the public funds : And whereas, together with the object just adverted to, I have sincerely at heart the welfare of the city of *Philadelphia,* and, as a part of it, am desirous to improve the neigh-

(Girard et al. *v.* The City of Philadelphia.)

bourhood of the river *Delaware*, so that the health of the citizens may be promoted and preserved, and that the eastern part of the city may be made to correspond better with the interior : Now, I do give, devise and bequeath, *all the residue and remainder of my real and personal estate* of every sort and kind, whersoever situate, (the real estate in *Pennsylvania* charged as aforesaid) unto 'the Mayor, Aldermen and Citizens of *Philadelphia*,' their successors and assigns, in trust, to and for the several uses, intents, and purposes hereinafter mentioned and declared of and concerning the same, that is to say : So far as regards my real estate in *Pennsylvania*, in trust, that no part thereof shall ever be sold or alienated by the said the Mayor, Aldermen and Citizens of *Philadelphia*, or their successors, but the same shall forever thereafter be let from time to time, to good tenants, at yearly, or other rents, and upon leases in possession not exceeding five years from the commencement thereof, and that the rents, issues, and profits arising therefrom shall be applied towards keeping that part of the said real estate situate in the city and liberties of *Philadelphia* constantly in good repair, (parts elsewhere situate to be kept in repair by the tenants thereof respectively) and towards improving the same, whenever necessary, by erecting new buildings, and that the nett residue (after paying the several annuities herein before provided for) be applied to the same uses and purposes as are herein declared of and concerning the residue of my personal estate : And so far as regards my real estate in *Kentucky*, now under the care of Messrs. *Triplett* and *Burmley*, in trust, to sell and dispose of the same, whenever it may be expedient to do so, and to apply the proceeds of such sale to the same uses and purposes as are herein declared of and concerning the residue of my personal estate."

" The following are the two codicils made by the testator :

" Whereas I, *Stephen Girard*, the testator named in the foregoing will and testament, dated the sixteenth day of *February*, eighteen hundred and thirty, have, since the execution thereof, purchased several parcels and pieces of real estate, and have built sundry messuages, all which, as well as any real estate that I may hereafter purchase, it is my wish and intention to pass by the said will: Now, I do hereby republish the foregoing last will and testament, dated *February* 16, 1830, and do confirm the same in all particulars. In witness, I, the said *Stephen Girard*, set my hand and seal hereunto, the twenty-fifth day of *December*, eighteen hundred and thirty.

" *Stephen Girard*." [L. S.]

" Signed, sealed, published, and declared by the said *Stephen Girard*, as and for a republication of his last will and testament, in the presence of us, who, at his request, have hereunto subscribed our names as witnesses thereto, in the presence of the said testator and of each other, *December* 25th, 1830.

" *John H. Irvin*,
" *Samuel Arthur*,
" *Jno. Thompson*."

(Girard et al. *v.* The City of Philadelphia.)

" Whereas, I, *Stephen Girard,* the testator named in the foregoing will and testament, dated *February* 16, 1830, have, since the execution thereof, purchased several parcels and pieces of land and real estate, and have built sundry messuages, all which, as well as any real estate that I may hereafter purchase, it is my intention to pass by said will : And whereas in particular, I have recently purchased from Mr. *William Parker,* the mansion house, out-buildings, and forty-five acres and some perches of land, called *Peel Hall,* on the Ridge road, in *Penn* township : Now, I declare it to be my intention, and I direct, that the orphan establishment, provided for in my said will, instead of being built as therein directed upon my square of ground between *High* and *Chesnut,* and *Eleventh* and *Twelfth* streets in the city of *Philadelphia,* shall be built upon the estate so purchased from Mr. *W. Parker,* and I hereby devote the said estate to that purpose, exclusively, in the same manner as 1 had devoted the said square, hereby directing that all the improvements and arrangements for the said orphan establishment prescribed by my said will as to said square shall be made and executed upon the said estate, just as if I had in my will devoted the said estate to said purpose—consequently, the said square or ground is to constitute, and I declare it to be a part of the residue and remainder of my real and personal estate, and given and devised for the same uses and purposes as are declared in section twenty of my will, it being my intention that the said square of ground shall be built upon and improved in such a manner as to secure a safe and permanent income for the purposes stated in said twentieth section.   In witness whereof, 1, the said *Stephen Girard,* set my hand and seal hereunto, the twentieth day of *June,* eighteen hundred and thirty-one.

" <em>Stephen Girard.</em>" [ L. S. ]

" Signed, sealed, published, and declared, by the said *Stephen Girard,* as and for a republication of his last will and testament, and a further direction in relation to the real estate therein mentioned, in the presence of us, who, at his request, have hereunto subscribed our names as witnesses thereto, in the presence of the said testator, and of each other, *June* 20, 1831.

" <em>S. H. Carpenter,</em><br>
" <em>L. Bardin,</em><br>
" <em>Samuel Arthur.</em>"

" On the 31st *December,* 1831, the will and codicils were duly proved before the Register of Wills for the City and County of *Philadelphia,* and on the same day letters testamentary were granted to the executors.

" The defendants are in possession of all the said real estate.  The deeds granting the estate mentioned to the said *Stephen Girard,* are to be considered as part of this case.

" If the court shall be of opinion that the said real estate, or any part thereof, was devised by and passed under the said will and codi-

(Girard et al. *v.* The City of Philadelphia.)

cils to the defendants, then judgment to be entered for the defendants, for the whole or such part of the said estate as was devised and passed.—If the court shall be of opinion that the said real estate, or any part thereof, was not devised by and did not pass under the said will and codicils, then judgment to be entered for the plaintiffs, for one undivided third part of the real estate, in the agreement mentioned, or for one undivided third part of so much thereof as was not devised by the said will and codicils, to the defendants."

When the cause was called up for argument at *December* term last, *Kittera* (with whom was *Broome*,) for the plaintiffs contended, that the real estate, which was the subject of these ejectments, having been acquired by the testator, after the date of the last codicil to his will, did not pass to the defendants. There is no doubt that the testator intended by his residuary clause, to make a disposition by will, of the real estate he might acquire afterwards, but there is as little doubt, that he was incapable of doing so in the manner in which he attempted it. Where the intention of the testator is consistent with the rules of law, it is an important guide in the construction of a will, but if it be in opposition to the law, it is no guide. In *England* and in almost every state in the union, the rule is settled beyond all doubt. There is no discordant opinion on the subject, and being so settled, no practical inconvenience can arise, unless it be that men may be frequently required to review their testamentary dispositions. The right of devising lands in *England*, is derived from the stats. 32 and 34 *H.* 8, and until the act of 1705, (*Purd. Dig.* 876,) in *Pennsylvania*, the only authority for such devises, was that of the statutes of wills. By that act, these statutes are not supplied, but a mere provision is made as to the mode in which wills shall be proved. A will is considered as a conveyance, or an appointment to a use, and can only operate on land of which the testator is seized at the time the will was made. 2 *Bl. Com.* 12. 375. 1 *Williams on Ex.* 6. *Arthur* v. *Bokenham*, 11 *Mod.* 148. 1 *Saund.* 277, n. 4. *Wind* v. *Jekyl*, 1 *P. Wms.* 575. *Harwood* v. *Goodright, Cowp.* 90. 7 *Ba. Ab.* 306. *Butler* v. *Baker*, 8 *Vin. Ab.* 64, case 2. *S. C.* 3 *Co.* 25. *Brunker* v. *Cook*, 11 *Mod.* 106. 127. *S. C. Salk.* 237. *S. C. Fitzgib.* 225. 2 *Eq. Ca. Ab.* 295. 3 *Br. P. C.* 19. *Roberts on Wills*, 16. 300. *Swift* v. *Roberts*, 3 *Burr.* 1497. *Holt*, 236. 243. 246. 248. 746. 747. *Burke* v. *Young*, 2 *Serg. & Rawle*, 383. 389. *Walker's Case*, 3 *Rawle*, 237. 2 *Penn. Bl.* 150. 4 *Kent's Com.* 497. *Minuse* v. *Cox*, 5 *Johns. Ch. R.* 450. *M'Kinnon* v. *Thompson*, 3 *John. Ch. R.* 307. *Smith* v. *Edrington*, 8 *Cranch*, 66. *Turpin* v. *Turpin*, 1 *Wash. R.* 75. *Hyer* v. *Shobe*, 2 *Mun.* 200. *Kendall* v. *Kendall* 5 *Mun.* 272. 7 *Harris & John.* 320. 1 *Murphy*, 258. 1 *Taylor*, 305. *Livingston* v. *Newkirk*, 3 *John. Ch. R.* 315. *Jackson* v. *Potter*, 9 *John. R.* 312. *Hays* v. *Jackson*, 6 *Mass, R.* 156. *Arndt* v. *Arndt*, 1 *Serg. & Rawle*, 264. 4 *Ba. Ab.* 427-320.

At the conclusion of Mr *Kittera's* argument, no counsel appearing

to argue the cause on the part of the defendants, it was continued until this term, when—

Scott and *T. Sergeant,* for the defendants, after observing that their clients, being trustees, were bound not to surrender any portion of the estate of the late Mr. *Girard,* unless the law required them to do so, argued that the property in question passed by the residuary devise in his will.    That it was his intention to dispose of the whole of the estate of which he might be the owner at the time of his death, it is impossible to doubt.    It is not only manifested by the residuary clause itself, but is declared in express terms in both the codicils. But it is said, that this intention, however manifest, cannot prevail, because it is inconsistent with a rule of law.    The question then is, whether this rule is the law of *Pennsylvania.*    No light is to be derived from decisions in other states, because the subject-matter of inquiry is entirely of statutory creation.    The power to bequeath even personal property is not a natural right, and in *England* was anciently restricted to two-thirds of the testator's moveables.    2 *Bl. Com.* 12.    Except by particular custom lands could not be devised until the year 1540, by virtue of the stat. 32 *H.* 8.· *Shep. Touch.* 420.

It is, therefore, no part of the common law brought from *England* by our ancestors, and which was to continue the law of *Pennsylvania,* until it should be altered by express enactment.    Being of statutory creation, the question is merely one of statutory construction.    But as the rule relied upon, is derived from *England,* and it has sometimes been said that the stat. 32 *H.* 8, extended to *Pennsylvania,* it is proper to examine that statute and the rules under it as they exist in *England,* to compare it with our own enactments, and to inquire, what has heretofore been said or decided on the subject.    It arose from feudal causes, that lands were not deviseable at common law. 7 *Ba. Ab.* 305.    1 *Eq. Ca. Ab.* 401.    The feudal tenures continued until the year 1660, when they were changed by stat. 12 *C.* 2, ch. 24. 2 *Bl. Com.* 76, 77.    All enactments, therefore, prior to that time, and all constructions of acts of Parliament, would preserve the taint of this original sin, and hence perhaps, the rule in question grew up. The statute of wills gives to all persons *having* or that may thereafter *have* socage lands, the power to devise them, and to all persons *having* lands held by knight service, the right to devise two-thirds of them, saving to the king, wardship, primer seisin, &c.    The decisions on this statute in the outset turned upon the word, "*having.*"    *Butler & Baker's Case,* 3 *Co. R.* 30, Anno 1590.    *Brett* v. *Rigden, Plowd.* 342.    Subsequently, a will was put upon the footing of a conveyance to uses.    *Arthur* v. *Bokenham,* 11 *Mod.* 149, Anno 1707.    *Brunker* v. *Cook,* 1d. 122.    The right to devise was, therefore, strictly construed upon feudal principles, and for the sake of the heir.    *Vaugh. R.* 262.    Even in *England,* however, the construction of this statute has been gradually ameliorated.    Contingent remainders and all contingent estates in lands are now held to be deviseable, in opposition

(Girard et al. *v.* The City of Philadelphia.)

to the opinion which formerly prevailed, that they did not pass by a will made previous to their vesting. 4 *Cruise*, tit. Devise, c. 3. s. 17. *Fearne*, 366, [289]. *Selwyn* v. *Selwyn*, 2 *Burr*. 1131. *Roe ex dem. Perry* v. *Jones*, 1 *H. Bl.* 32. The cases which support the rule contended for by the counsel for the plaintiffs, are those of acquisitions not anticipated by the testator. But where the future possession of the property is anticipated, it does pass; as where land is contracted for previous to making the will. *Prideux* v. *Gibben*, 2 *Ch. Ca.* 144. *Davie* v. *Beardsham*, 1 *Ch. Ca.* 39. *Acherly* v. *Vernon*, 9 *Mod.* 68. *Lingen* v. *Sowray*, 1 *P. Wms.* 172. 2 *P. Wms.* 169. *Pullen* v. *Ready*, 2 *Atk.* 592. So, where the contract failing a like sum is ordered to be invested in other lands for the devisee. *Whittaker* v. *Whittaker*, 4 *Br. Ch. Ca.* 31. So, though the will be made before the period at which, by the contract, the lands are to be passed and delivered. *Greenhill* v. *Greenhill*, 2 *Vern.* 679. *Potter* v. *Potter*, 1 *Ves.* 437. The last case is emphatically put upon the *clear intent* of the testator, to die testate as to every part of his estate, and is very analogous to the case at bar.

The question as to decision at least, is an open one in *Pennsylvania*. The settlement of the province under the charter granted in the year 1681, in the 33d year of the reign of *Charles* II. was after feudal tenures had ceased in *England*. It was granted to *Wm. Penn* in free and common socage. The right to devise lands was assumed and taken for granted by the settlers. At this early period, there was no occasion for any refinement in the law, in relation either to conveyances or to wills. Titles were then inchoate, and some of them for more than half a century were considered personal property. The act of 1705, [1 *Sm. L.* 33.] was then passed, and became the law of last wills. There was no occasion for the adoption of the stat. 32 *H.* 8, and accordingly, it is not reported as in force by the judges. This act assumes the power to devise as an existing, unqualified right, and does not restrict it to persons *having* lands, and puts the exercise of it, upon the same footing, as to both real and personal estate. If the intention had been to refer to or adopt the statute of *H.* 8, it would have appeared in the act, which however has nothing in it like a supplement or law in *pari materia*. How are the words " thereby *given* or *devised*," to be construed except as giving and devising all that the will says it does, for the law says, it " *shall be available*" for that purpose. To say otherwise, would be to reject the words of the act, which the court have no right to do. If it be said, how can a man give that which he has not, the answer is, that this creates no difficulty as to personal property, even in *England*, and by our act of assembly, real and personal property are, as to the power and mode of testamentary dispositions, treated exactly alike. One hundred and twenty-eight years have elapsed since our act relating to wills, and there has been no decision in opposition to the reading now given of it. A few loose *dicta* only are to be found, which an examination of the cases in which they occurred, will show to be entitled to little

(Girard et al. *v.* The City of Philadelphia.)

consideration.   On the other hand, there are cases on analogous subjects, adverse to this principle.   A grantor out of possession may make a legal transfer of his estate.   *Stoever* v. *Whitman,* 6 *Binn.* 416.   A testator may devise land of which he has been disseised.   *Humes* v. *M'Farlane,* 4 *Serg. & Rawle,* 435.   These are encroachments upon the law of *England,* which is the other way.   2 *Touch.* 428. *No.* 13. But we live under a different meridian from that of *England,* and many of their rules of law have not been adopted, because they are inapplicable to our form of government, local institutions, habits and manners.   *Steinhauer* v. *Witman,* 1 *Serg. & Rawle,* 448, per DUNCAN, J.   What may be the rule in other states is of little consequence.   It depends upon their own enactments, or their adoption of the *English* statutes, and accordingly the rule of one state differs from that of another.

There is, however, another obstacle to the plaintiffs' recovery. They are legatees under the will, the provisions of which they are endeavouring to defeat.   They must elect to abandon either the after-purchased property, which the testator has expressly declared, shall pass, or their legacies.   They cannot take both under the will, and against it, and the court have the power to put them to the election.   *Sug. on Vend.* (*Ingraham's* ed. 1820) 138.   *Sug. on Powers,* 380.   *Brown* v. *Ricketts,* 3 *John. Ch. R.* 553.   *Noys* v. *Mordaunt,* 2 *Vern.* 581.   *Streatfield* v. *Streatfield, Talb.* 176.   *Cauffman* v. *Cauffman,* 17 *Serg. & Rawle,* 24. 1 *Swanst. Ch.* 435. 13 *Ves.* 220.

*Sergeant,* in reply, (*Chauncey* was with him.)—A short review of the history of legislation in *Pennsylvania* in reference to last wills will show, that a distinction has always been kept up between real and personal estate.   The sixth section of the charter granted by *Charles* II. to *Wm. Penn,* on the 4th *March,* 1681, declares, "that the laws for the regulation and governing of property within the said province, as well for the descent and enjoyment of lands, as likewise for the enjoyment and succession of goods and chattels, and likewise as to felonies, shall be and continue the same, as they shall be for the time being by the general course of the law in our kingdom of *England,* until the said laws shall be altered by the said *William Penn,* his heirs or assigns, and by the freemen of the said province, their delegates or deputies, or the greater part of them."   At the date of the charter, any will in writing was good in *England* to pass personal property, but to make a valid testamentary disposition of lands, the formalities prescribed by the statute of frauds, 29 *C.* 2. c. 3, were required.   That statute was passed in the year 1676, and took effect on the 24 *June,* 1677.   Before the proprietary and the adventurers concerned with him left *England,* certain laws were agreed upon on the 5th *May,* 1682, the fifteenth of which provided, that all *wills* and writings attested by two witnesses shall be of the *same force* as to lands as *other conveyances,* being legally proved within forty days, within or without the province. *Prov. L. Appx.* 4.   The 45th chapter

(Girard et al *v*. The City of Philadelphia.)

- of the laws passed at *Chester* on the 7th *December*, 1682, (*Prov. L. Appx.* 7,) was a re-enactment of the law just stated, and this act as amended by the act of 1705, 4th Queen *Anne*, (*Prov. L.* 30,) remains in force to this day. Among the laws passed at *New Castle* between the 14th of *October* and the 27th *November*, 1700, (*Prov. L. Appx.* 17,) it is enacted that, to the end that lands and hereditaments may be enjoyed by the devisee and his heirs, as *amply as lands granted by deed to the grantee*, all wills in writing wherein or whereby any *lands, tenements* or *hereditaments* within this province or territories, are or shall be devised, shall be as good and authentic in law according to the tenor thereof, as *any other conveyance* for granting of such lands and premises, whether the said wills be made within or out of this province or territories. This act was repealed in council, and the act of 1705 passed to supply its place. Thus it appears that no provincial legislation was deemed necessary on the subject of wills of personal estate, and therefore all the laws passed during a period of more than twenty years, relate wholly to wills of real estate, which, as well as testaments of chattels were previously governed by the law of *England*. It is to be observed, however, that all these laws expressly put such wills on the footing of conveyances. They alter the law as regards the *proof* of the instrument, but not as to its *nature*, as it was understood before. The respect paid by the proprietary and our early legislatures to lands, was greater than seems to be imagined. Personal estate was always the primary fund for the payment of debts, and originally the whole of a debtor's lands could not be applied even as an auxiliary for that purpose. By the laws agreed upon in *England*, sec. 14 (*Prov. L. Appx.* 4,) it is declared, that all lands and goods shall be liable to pay debts, except where there is legal issue, and then all the goods and one-third of the land only. This provision was altered by the law passed at *Chester, December* 7th, 1682, (*Prov. L. Appx.* 7.) which made all the goods liable for debts, and where there was legal issue, *one-half* of the lands. By the law passed at *Philadelphia* on the 10th *May*, 1688, to continue in force one year, (*Prov. L. Appx.* 10,) all a debtor's lands were made liable for his debts, and this was made perpetual by an act passed 1st *June*, 1693, (*Prov. L. Appx.* 14.) Nor was there always a full power of alienation by will. By an act passed 1 *March*, 1683, (*Prov. L. Appx.* 9,) one-third of a man's estate is directed to go at his death to his wife, one-third to his children equally, and the other third "as he pleaseth." The act of 1 *June*, 1693, (*Prov. L. Appx.* 13,) provides, that if the personal estate be sufficient for the payment of debts, "all a testator's *real estate* shall be invested and remain as their last wills and testaments devise the same," and the act of 1697, (*Prov. L. Appx.* 14,) contains the same provision. This brief review of the early laws shows the marked distinction always kept up between real and personal estate. But this distinction is not peculiar to the common law. It is founded in the nature of things. In the civil law and in all the codes derived from it, there is the same distinction between *mobilia*

*et immobilia.* If this doctrine be correctly understood, then the *intention* of the testator is immaterial, for it cannot be legally executed. There is a wide distinction between an intention to do a thing and an intention to do it by the will. With this distinction Mr. *Girard* was familiar, as is clearly shown by the two codicils made for the purpose of passing real estate which he had acquired after his will was made. He intended to do what was necessary in order to vest in the defendants the estate he might afterwards purchase, but omitted to carry that intention into effect in the manner the law required, and consequently his intention is no more available than if he had intended to make a will, but had neglected to do so. It is the act and not the intention, that makes a testamentary disposition. A will derives its efficacy entirely from the law, a want of conformity to which renders it nugatory. If it be not in writing, or if it be proved by only one witness, it is no will, whatever may have been the intention of the party who supposed he was disposing of his property by will.

When Mr. *Sergeant* had gone thus far in his argument, he was stopt by the court.

The opinion of the court was delivered by

GIBSON, C. J.—In the report of the judges on the statutes, nothing is said about the 32 and 34 *Hen.* 8. which are therefore to be taken as not in force here; but whether they were considered as having never been so, or as supplanted by our statute of 1705, cannot be positively known. They were most probably thought to be repealed and supplied, as they were entirely within the rule laid down by Lord HOLT in *Blankard* v. *Galdy,* 2 *Salk.* 411, and repeated by the Privy Council, as appears from the relation of the Master of Rolls in 2 *P. Wms.* 75; that an emigrant colony carries with it the laws of the parent to an uninhabited country; or even to one acquired by conquest, so far as regards matters in respect to which the existing laws are silent, or enjoin what is immoral, or are contrary to the religion of the conqueror. It is plain that a country whose entire population has been displaced to make room for the new comers, is an uninhabited country for the purpose of receiving their laws; and therefore it seems singular, that the distinguished judge who ruled *Blankard* v. *Galdy,* should shortly afterwards have held, in a case which involved the legality of slavery, that the laws of *England* did not extend to Virginia, being a conquered country; and the more so, as the laws of the aborigines, if they had any, could not be supposed to have provided for the subject. Be that as it may, our courts have always held that the laws which were in force at the foundation of the colony, and not positively unsuitable to the condition of the colonists, were brought by them hither; and it cannot be thought that laws which enabled them to dispose of real estate, were unsuitable. During the twenty-four years that elapsed between the charter and our statute, they could not have been without provision on the subject, and I know of none that was competent to satisfy their necessities but these very statutes; for it will appear in the sequel, that the inter-

vening legislation on the subject of wills, had regard to the proof of the instrument and not the power of the testator, with perhaps the single exception of the act to direct " how the estate of any person shall be disposed of at his death," passed the 10th of *March,* 1683. By that act, which may be seen in the Appendix to *Hall & Sellers's* edition of the laws, page 9, it was provided : " that whatsoever *estate* any person hath in this province or territories thereof, at the time of his death, unless it appear that an equal provision be made elsewhere, shall be thus disposed of; that is to say, one third to the wife of the party deceased, one third to the children equally, *and the other third as he pleaseth;* and in case his wife be deceased before him, two thirds shall go to the children equally, and the other *third to be disposed of as he shall think fit,* his debts being first paid." In the margin we have these observations by Chief Justice Kinsey : " 1. This act seems to *restrain* the power of devising more than one-third of the lands of which a man died seised.   2. This law, for aught I find to the contrary, continued till the first of the fourth month, 1693, when a law passed authorizing a man to devise all his real estate." This repealing law I have been unable to find.   But it is observable that the act of 1683, included land, if at all, only by force of the word ' *estate*' and not of any more specific term : so that it is by no means clear that the inclination of Judge Kinsey's opinion, for he spoke doubtingly, accorded with the true construction or actual understanding of the times.   He could not have known by experience the construction put on the act in practice, for his notes were written probably forty years after the repeal of it; and if he had been a member of the profession during that period, he was not till 1730, an inhabitant of *Pennsylvania.*   Granting his opinion to be that land was included, it is pretty evident the crown thought otherwise; for judging from the jealousy evinced by it in the case of much less important innovations, it is scarcely to be believed, that it would have tolerated for ten years so violent an infraction of the spirit of the charter, which required a conformity of the laws to those of the mother country, as a restriction of the power of devising to a third of the testator's land, or the dower of his widow to be turned to a fee.   But if it were even applicable to land, still it was viewed by the chief justice but as a restraining statute, not an enabling one ; and this plainly shows what, in his opinion, was the law before.   It was therefore to remove a doubt of the interpretation, or to repeal the law taking the interpretation of the chief justice to have been established —in any event to restore the law to its former footing—that the act of which he speaks, was passed in 1693.   Of the legislation which took place in relation to proof of the instrument, I shall have occasion to speak in the sequel.   It seems pretty clear, then, that the English statutes of wills were originally in force with us, and not reported as being so still, only because the judges thought that our own statute was designed to supersede them in their whole extent.   Judging of the substitute by its provisions, it might perhaps as naturally have

(Girard et al. *v.* The City of Philadelphia.)

been deemed but ancillary to them, as performing the same office in regard to them here, by exacting in addition to their requirements the observance of particular solemnities as matter of proof, that is performed by the statute of frauds in *England.* But even as an enabling statute, our act of 1705 was not a new law, but an act of legislation on the basis of an old one, which is therefore to be taken into consideration in the interpretation of inexplicit clauses, because it is reasonable to presume that no departure from the existing law was intended, further than is expressed. For this reason it is, perhaps, that the act has always been understood by the profession, in accordance with the British statutes. Had a variance been suspected, it must long ago have been put to the test of judicial decision; but no trace of such suspicion is to be found in our judicial records. It is argued, that whatever the general rule may be, the clauses in the codicils of this will, which require real estate acquired subsequently, to pass as if it were then the estate of the testator, make the case an exception to it; and the question therefore is not one of intention, but of power. But even in the case of a general residuary devise, the intention to pass the estate is taken for granted; and what is there in the specific expression of such an intention here, but a greater degree of certainty in respect to what is in other cases taken for granted? Nothing in the books but the *dictum* in *Brett* v. *Rigden, Plowd.* 344, gives colour of authority to the supposed distinction. There it is said to have been determined in the 39 *H.* 6, 18, that if a man devise a certain estate, and have nothing in it at the time, but purchase it afterwards, it shall pass; because, as it is said, it must be taken that his intent was to purchase it, and were it not to pass, the will would be void. All this was repudiated by Lord HOLT in *Bunker* v. *Cook,* 11 *Mod.* 278, (*S. C. Fitzg.* 225,) as being not even the *dictum* of a judge, but an assertion of counsel, and unwarranted by the book cited for it; in which he is supported by Chief Justice TREVOR, in *Arthur* v. *Bokenham,* 11 *Mod.* 163. (*S. C. Fitzg.* 233.) In truth the matter never depended on the actual intent; nor yet, as it was at one time supposed, on the restrictive words of the English statutes, and it is therefore of no importance to the question, that those statutes were not reported as in force here. It is true that in *Butler & Baker's Case,* Lord COKE laid great stress on those words; but in *Bunker* v. *Cook,* or *Broncker* v. *Coke,* as it is reported in *Holt's Rep.* 247, it was asserted by Lord HOLT, that Chief Justice BRIDGMAN had differed from Lord COKE in attaching importance to them, in a case determined in the Common Pleas, the 16 *Car.* 2, and that the judges in the exchequer chamber were of the same opinion: this too on the relation of Chief Justice BRIDGMAN himself. But what puts the matter at rest is, that in this case of *Bunker* v. *Cook,* the rule was applied in all its rigour to lands which were devisable, not by force of the statute at all, but by custom; and the judgment was affirmed in the House of Lords. The doctrine was vigorously maintained in that case, as well as in *Buckenham* v. *Cook,*

(Girard et al. *v.* The City of Philadelphia.)

*Holt's Rep.* 248, by Lord HOLT; and in *Arthur* v. *Bokenham*, by Chief Justice TREVOR, who together rested it on these propositions: That a will is a species of conveyance, not strictly subject to the rules of conveyances at the common law it is true, the vesting of the estate being postponed till the death of the testator; yet operating, as regards his disposing power and capacity, by relation to the making of it, insomuch as to require his power over the estate to be perfect at the time, just as his capacity must be perfect at the time, it being settled that the want of a disposing mind and memory at the performance of the act of disposition, is not supplied by the restoration of it before the death, for the same reason that an intervening loss of it will not prejudice a disposition unexceptionable at the time—in other words, that the act of disposition must be complete in every respect at the performance of it: That a testator, like any other grantor, cannot give what he has not; and that the same principle prevails in conveyances to uses, though construed liberally like wills, to favour the intention, as in *Yelverton* v. *Yelverton, Cro. Eliz.* 401, where a father covenanted to stand seised of land which he should purchase: That the form of pleading a devise, the testator always being described as seised at the time of making his will, is strong though not conclusive evidence of the necessity that he should be so in fact: That the reason why land differs in this respect from personal estate, is that the common law has provided in the event of intestacy, a fixed successor to the one and not to the other, even the statute of distribution being but a direction to the executor how to administer the assets; by reason of which, and the fluctuating nature of personal estate, which is changing every day, a different rule would require a new will to be made every day: That a subsequent purchase giving the land to the testator, is repugnant to the import of the devise, which would give it to the devisee; and therefore not to be intended to have been made in subservience to the object of the will: And finally, that there is no case or authority to warrant the opposite doctrine. To the argument of such men as these, it would be presumptuous in me to attempt an addition, and I therefore refer the student to their reasons as stated in the report. The alleged dependence, then, of the doctrine on the restrictive words of the British statutes being disposed of, it results that the question stands here exactly as it did in *England*, unless the specific provisions of our own statute be thought to make a difference.

The clause which has been supposed to make this difference, is in the first section. After requiring proof by two witnesses, and establishing a mode for its authentication, it is declared that wills so proved, 'shall be good and available in law for the granting, conveying, and assuring, of the lands or hereditaments thereby given or devised, as well as of the goods and chattels thereby bequeathed;' and from the parity of provision thus expressed, is inferred an intention to create a parity of operation and effect. That such was not the object, seems manifest from the legislation which preceded it. By

(Girard et al. *v.* The City of Philadelphia.)

the fifteenth law agreed upon in *England*, it was declared, that 'all wills and writings attested by *two* witnesses, shall be of the same force as to lands as other conveyances, being legally proved within forty days, either within or without the said province.' This was evidently designed to preclude that provision of the statute of frauds which requires three witnesses, and is worthy of special notice beside, not only for treating wills of lands as conveyances, but for putting them on the footing, as to proof, of testaments of chattels, which by the canon, and consequently by the English law, require but two. *Lea* v. *Libb*, 3 *Salk.* 396. This fundamental law received a regular statutory form from the first assembly, convened at *Upland*, in 1682, by whom it was enacted as the forty-fifth section of the Great Law, and in the terms in which it had been expressed in *England*, with the exception of two immaterial words introduced, the last of them evidently by inadvertence. Chief Justice KINSEY's note in the margin is: 'This act as amended in the fourth of Queen *Anne*, remains to this day.' *Prov. Laws*, *App.* 7. Now, the fourth of Queen *Anne*, which he pronounces but an amendment, is the very act under consideration; and it seems clear, therefore, that he considered the act of 1682, as the law of his day, except so far as it was amended by the act of 1705. His notes were written certainly after 1713, as they contain a reference to acts passed in the close of that year, and probably after 1730, when he removed from *New Jersey* to *Pennsylvania*. He was appointed chief justice about the year 1743, and died in that office, according to *Proud*, in 1750. The act of 1682, however, was amended only as to the time of proof, and the manner of authenticating it, the requisition of two witnesses being preserved. But this is not all. An act had been passed at *New Castle*, in 1700, (*Append. to Prov. Laws*, 7,) which expressly following the analogy of conveyances as to the effect of the instrument, required no more than *legal* proof without specifying the number of the witnesses. It therefore had, or might be supposed to have, the effect of putting wills of lands upon a lower footing as to proof than wills of chattels, about which it said nothing, and consequently left them on the footing of the general law. To say the least, it was open to an argument that one witness was sufficient for a will of land, as in the case of any other conveyance of land. This act having been repealed by the Queen in council, as may be seen in *Weis & Miller's* edition of the laws, page 18, our present act was passed in the same year, and the requisition of proof by two witnesses restored, with new provisions added, as to the mode of authenticating it; and thus the reduction in the quantity of proof made by the act of 1700, was taken away, and wills of land were again put, as to proof, on the footing of testaments of chattels. It is needless to ask why. It was an express condition of the charter, that the laws for the regulation of property should conform, as nearly as might be, to the laws of *England*, till altered by the provincial legislature; and the same jealousy of innovation, which prompted the crown to repeal the act for the abolition of sur-

vivorship between joint tenants, passed in 1700, as well as the two acts for barring entails by a deed acknowledged and recorded—the one passed in 1705, and the other in 1710, (*Hall & Sellers's* edition of the laws, Append. 18, 19,)—might, on a question of further departure from the statute of frauds, induce it to stickle about a witness more or less. The clause in our statute of wills, to which I have particularly adverted, seems therefore to have reference to the *proof*, and not the effect of the instrument, or, at least, no further than the latter may be supposed to depend on the former. The first was all that was in contest between the province and the crown. The fif-teenth law agreed upon in *England*, or rather the act of 1682, re-mained in force twenty-three years without opposition; and *during* that time, wills of lands and testaments of chattels stood on the same footing. But no sooner did the act of 1700 reduce the proof of the former, or bring it into doubt, than it was repealed by the privy council; and when the present act of 1705 raised it again to the level of the act of 1682, the crown acquiesced. At no time does there appear to have been a disposition to change the effect of a will of lands as understood in *England*; indeed, the very suspicion that such a design was harboured, would have defeated it. On the contrary, the language of all our laws is incomparably more emphatic than that of any act of Parliament, to show that a will of lands was es-teemed a conveyance and no more. In the very act before us, a will proved in the manner prescribed, is declared " to be available in law for the *granting, conveying,* and *assuring* of the lands or heredita-ments thereby given or devised"—words that are properly predicable only of conveyances of land by deed; and though they are used in the same clause as predicable of the transfer of chattels also, they are so used, as regards the incidents peculiar to each, *reddendo singula singulis.*

This sketch of the legislation which preceded the act of 1705, and which is here given in the order, and nearly in the words of a distinguished counsel, to whose research I am indebted for it, seems to put the intention of the legislature beyond the reach of doubt. The magnitude of the interest in contest, amounting as it does in value to more than sixty thousand dollars, as well as a respect for the doubt suggested by my brother HUSTON, has induced me to examine the foundations of this part of our law with peculiar care; and the result is a firm conviction, that the real estate acquired subsequently to the two codicils, did not pass by Mr. *Girard's* will: consequently, the plaintiffs are entitled to the succession under the intestate laws.

Judgment for the plaintiffs.