## Gable's Executors *versus* Daub.

*After-acquired Real Estate when included in general Devise.—Act of April 8th 1833 construed.—Effect of electing to take or reject Property given by Will.*

One, by will dated in 1829, devised to his wife all the real estate of which he should die possessed: in 1847 he purchased a farm, which he held until his death, in 1850, when his widow entered into possession under the will: in 1857 she sold the farm, taking as a part of the purchase-money three judgment bonds, and the same year died, leaving a will, wherein she gave one half of the residue of her estate to her own brothers and sisters, and the children of such as were deceased, and the other half to the brothers and sisters of her deceased husband, and their children. After her death, her executors issued executions upon the judgment bonds, given for the farm sold by her, which were stayed by the court, and the defendant—the purchaser—let into a defence, upon the ground that the title was not in the widow, but in the heirs of her husband. *Held*,

1. That the will of the testator, executed in 1829, did not pass the farm purchased by him in 1847, as the 10th section of the Act of 8th April 1833, providing that real estate acquired by the testator after the date of his will shall pass by a general devise, did not apply to a will dated before its passage.

2. But that, if the heirs of the testator, who were his brothers and sisters, and their children, and who, under the will of the wife, were entitled to one-half of all the property of which she died possessed, including the judgment bonds given for the purchase of the farm, should elect to take under that will, their title would pass to the defendant, the purchaser, and the plaintiffs, her executors, were entitled to recover on the judgment bonds given by him, as the words of the will of the testator were sufficient to include after-acquired real estate, and *his* heirs could not claim both under and against *her* will.

ERROR to the Common Pleas of *York county*.

This was an action of debt brought by Elias Tome and Michael Gable, executors of Veronica Gable, against Jacob Daub, on a bond executed by the defendant to the deceased, the consideration of which, with several others, was a tract of land in Windsor township, York county, sold by her to the defendant, in which the following case was stated for the opinion of the court.

On the 29th day of January 1829, Frederick Gable, the husband of Veronica Gable, deceased, made and published his last will and testament, by which he provided, among other things, as follows: "Item. I give, devise, and bequeath unto my dear wife Fronica (Veronica) all that remainder of my personal estate; also all that my real estate, consisting of houses, land and plantations, being the same whatsoever and wheresoever, situate in the county of York and elsewhere, that I shall die owner or possessed of, or being in my right to have and to hold all that my real and personal estate unto my dear wife Fronica (Veronica) to her sole use, benefit, and behoof, and to her heirs and assigns for ever."

[Gable's Executors *v.* Daub.]

At the date of said will Frederick Gable was seised of divers parcels of real estate, consisting of houses, land, and plantations, some of which he afterwards sold.

On the 6th day of May 1846, Simon Smith, administrator of Henry Dohn, deceased, obtained an order of the Orphans' Court of said county, for the sale of the real estate of his intestate for the purpose of paying debts, in pursuance of which order he afterwards sold the premises first above mentioned to the said Frederick Gable, and the sale being confirmed, he executed his deed as administrator for said premises to said purchaser on the 23d day of March 1847, who thereupon entered into possession of the said premises, and held the same to the date of his death, when his said widow entered into possession and held the same until the 1st day of April 1857.

Frederick Gable died in August 1850, and his said last will was duly proved and recorded in the register's office of said county, on the 28th day of September 1850, when letters testamentary thereon were duly granted to the said Veronica Gable, therein named as executrix.

On the 30th day of November 1852, the said Veronica Gable made and published her last will and testament in writing of that date, wherein she directed all her real estate to be sold by her executors, the plaintiffs above named, and the whole of her estate, real and personal, to be divided into two equal parts, one of which she gave to the brothers and sisters of the said Frederick Gable, deceased, and to the children of such of them as were dead, and the other half to her own brothers and sisters of the full blood, and the children of such as were dead, as in the said will mentioned. At the date of her will she was seised of various parcels of real estate, of which she was the owner at her death, and was also entitled to a large amount of outstanding claims and debts in the name of her late husband, and due to her as his legatee.

On the 1st day of April 1857, Veronica Gable executed her deed of that date, with special warranty, conveying to Jacob Daub, the defendant, the said tract of land in Windsor township in said county, for the consideration of $1600. Six hundred dollars were paid in part of the purchase-money, and for the remainder bonds of that date with warrants of attorney were given, and were entered to January Term, Nos. 354, 355, and 356. The defendant, ignorant of any question about the title at the execution of said deed, took peaceable possession, and has since held the same.

Veronica Gable died on the 9th day of October 1857, and letters testamentary on her said last will and testament, after probate thereof, were duly granted to the plaintiffs, her executors therein named, who upon citation issued on the 7th day of Jan-

uary 1859, at the instance of some of the heirs of the said Frederick Gable, deceased, legatees as aforesaid, filed their first. separate accounts of their trust on the 24th day of January 1859. After the death of Veronica Gable, the plaintiffs, her executors, issued executions on said judgments, which were stayed on affidavits of the defendant, and the court afterwards, on the 16th day of February 1859, opened the said judgments and allowed the defendant to make a defence. Afterwards, on the 6th day of January 1860, the Orphans' Court of said county appointed an auditor to make distribution of the balances on said accounts among the persons entitled to the same under the will of the said Veronica. The greater part of the known heirs of the said Frederick Gable, deceased, to whom legacies were given by the will of· said testatrix as aforesaid, having always claimed said legacies,. appeared in person or by counsel, with the other legatees, before the said auditor, and asked to have said legacies awarded to them by the said auditor, which was accordingly done; but the legacies are not paid, nor is the report finally confirmed. The second separate accounts of the said executors were filed on the 14th day of December 1859, and are now pending before an auditor on exceptions by legatees who are heirs of said Frederick Gable, deceased. The first account above mentioned contains no part of the proceeds of real estate. The second accounts above mentioned contain a small amount of the proceeds of real estate of which Veronica Gable, deceased, died seised; and no moneys not already collected are included in any of them.

The inventory of the personal estate of Veronica Gable, including a large number of debts owing to her, some in her husband's name, amounted to $21,208.80. The number and value of the parcels of real estate she held at her death are not determined, but the value is much less than the personal estate, and it is not yet ascertained what parcels of real property the said Frederick Gable held at the date of his will, and what he purchased afterwards, nor the value of them respectively.

The said Veronica Gable was bargaining with another party for the sale of the property first above mentioned within a year preceding her said sale and conveyance thereof to the defendant; and in that transaction was informed by said party that he objected to buying the property on the ground that he was advised that it did not pass to her by the will of her husband.

Eve Fox and Lydia Runcroft, sisters of said Frederick Gable, deceased, and Rebecca Wall, a niece of said decedent, and daughter of his deceased brother Daniel, were all living at the date of his death, and died afterwards intestate in the lifetime of said Veronica Gable, deceased, all leaving issue, still living, and all having husbands who survived said Veronica, and are

[Gable's Executors *v.* Daub.]

still living, except the husband of Eve Fox, who died about two months ago.

Ann Paul, not included in the above-mentioned distribution by the auditor, claims to be a legatee as a child of George Gable, deceased, who was a brother of said Frederick Gable, deceased, and therefore excepts to said distribution; but it is alleged that her father was another George Gable, and that the said brother left no issue, and said matter is yet undecided."

The court below, after stating the main facts of the case, and that the questions were whether Mrs. Gable took an estate in fee simple, under the will of her husband, in the property sold to the defendant, and whether the devise was within the purview of the 10th section of the Act of April 8th 1833, which provides that real estate acquired by a testator after making his will, shall pass by a general devise, unless a contrary intention be manifested on the face of the will, decided that the real estate, which was the consideration of the bond on which suit was brought, did not pass to Mrs. Gable by the will of her husband, and accordingly entered judgment in favour of the defendant on the case stated.

This writ was thereupon sued out by the plaintiffs below, who assigned for error the entering of judgment for defendant as above stated.

Pending the proceedings, the executors above named were superseded by order of the Orphans' Court of York county, and others appointed in their stead.

The case was argued in this court by *John Williamson, Samuel Hepburn,* and *Thomas E. Cochran,* for plaintiffs, and by *Evans & Mayer* for defendant.—The elaborate review of the authorities presented in the opinion of this court, renders a report of the able argument of the learned counsel above named unnecessary.

The opinion of the court was delivered, January 6th 1862, by

READ, J.—Lord Mansfield, in Harwood *v.* Goodright, Cowper's Reports, p. 90, thus states the law of England in regard to devises of lands : "Though as to personal estate, the law of England has adopted the rules of the Roman testament, yet a devise of lands in England is considered in a different light from a Roman will. For a will in the civil law was the institution of the heir. But a devise in England is an appointment of particular lands to a particular devisee, and is considered in the nature of a conveyance by way of appointment ; and upon that principle it is, that no man can devise lands which he has not at the date of such conveyance. It does not turn upon the construction of

the statute 27 H. 8, which says, that any person having lands, &c., may devise. For the same rule held before the statute where lands were devisable by custom."

This, undoubtedly, was the law of Pennsylvania under the Act of 1705, and was recognised by the revisers in their report of the 1st March 1832, and what is now the 10th section of the Act of 8th April 1833, was drafted by them and adopted by the legislature in order to change this rule for the future. So prior to the Statute of Frauds a will of lands might have been republished by parol, and would have all the effect of an original will from the time of its republication, and would pass lands purchased by the testator between the first execution and the republication, and such also was the law of this state: Howard v. Davis, 2 Binn. 406; Jack v. Shoenberger, 10 Harris 416.

Devises to charitable uses became so frequent in England, particularly by languishing or dying persons, that the statute of 9 Geo. II., ch. 36, was passed, enacting, that after the 24th June 1736, no lands, or money to be laid out in lands, or any interest in lands, shall be given or conveyed for the benefit of any charitable use whatever, unless by deed executed in the manner prescribed twelve calendar months before the death of the donor or grantor, and enrolled in the Court of Chancery within six calendar months from its execution.

A question soon arose as to the devises to charitable uses executed before the statute, where the testator died after it went into operation, and was brought before Lord Chancellor Hardwicke, in the case of Ashburnham v. Bradshaw, reported in 2 Atkyns 36, and which was decided upon the equity reserved on April 26th 1740. This was a devise to charitable uses under a will in 1734. The testator lived till July 1736, a month after the new statute of mortmain took place, and then died without revoking his will: it was referred by the Court of Chancery to the judges for their opinion, whether this was a good disposition to charitable uses; and all of them, except Mr. Justice Denton, who was ill, certified that the devise to these uses was good in law, notwithstanding the act, and thereupon the Lord Chancellor declared the will should be established and the trusts of the charity carried into execution. This case is noticed *arguendo*, in Attorney-General v. Lloyd, 1 Vesey Senior, p. 33, S. C. 3 Atkyns 552, in this wise: "The testator dying after the late mortmain act made in 1736, the first question whether the devise of the real estate to charity by his will made before this act is good, cannot now be disputed, for it was determined before the twelve judges in Ashburnham v. Kirkhall (Bradshaw), while the present suit was depending at the Rolls, that the devise in such case was good."

[Gable's Executors *v.* Daub.]

The same doctrine is stated in Willet *v.* Sandford, 1 Vesey Sr. 178 and 186, where it was held that a codicil made after the mortmain act, to a will made before it, was a confirmation and not a revocation of it, and the will was accordingly established. In the Attorney-General *v.* Andrews, 1 Vesey Sr. 225, the testator made his will before the statute of mortmain, devising his copyhold lands to a charity. He had some copyhold surrendered to the use of his will, and other copyhold not surrendered, all of which the Lord Chancellor held were included by the terms of the will. To the objection of the mortmain act, he replied, the doctrine already settled, saying, " this will was made before the day on which the act took place, and all the cases arising before must be left on the same rules of law and equity." To that of the Statute of Frauds, he cited the case of Tuffnel *v.* Page, April ·1740, 2 Wms. 262 (S. C. 2 Atkyns 37 ; and see Id. 497), where *cestui que trust* of copyhold lands devised it without any surrender to the use of his will, and the question was, whether the court would make that good, the will having no witness at all ; and it was held sufficient to pass the trust on the foundation of there being former determinations and standing on the statute of H. 8, which passes lands by will in writing, though no witness at all, of which there are several cases by Lord Coke, as of a will wrote and not finished, which was good for so much.

In The Attorney-General *v.* Bradley, 1 Eden 482, where a power of appointment to a charity defined in a will made before the statute was executed by a will made after the statute, it was held that the appointment was not avoided by it, as the execution of the power had relation to and was part of the will, and therefore no more affected by the statute than a will inchoate before the statute where the testator died after it. A most remarkable exemplification of the unbending nature of this rule of the English courts is to be found in the case of the· Attorney-General *v.* Downing, Dick. 414; (S. C. Wilmot's notes 1, 35 ; Ambler 550.) The testator's will was dated in December 1717, and he died in 1749, thirteen years after the mortmain act, and thirty-two years after the execution of his will. The devise was for the erection of a college to be called Downing College, in Cambridge, and to obtain a royal charter for founding such · college and incorporating a body collegiate by that name in the University at Cambridge, and upon information and relation of the University of Cambridge, it was declared that the trusts of the will ought to be carried ·into execution in case the king should be pleased to grant his charter to incorporate the college, and his royal license for such incorporated college to take the devised premises in mortmain, and a charter of incorporation was accordingly granted half a century afterwards, on the 22d September 1800.

Such was the state of the law when the revisers, in their report, recommended the passage of a bill relating to last wills and testaments, making some important alterations in it, which, with a few changes, became the law of the land on the 8th April 1833. As nothing was said in this act relative to wills already executed, it was evident that the new provisions requiring the signature of the testator at the end of the will, and directing that devises of real estate shall pass the whole estate of the testator although there be no words of inheritance or perpetuity, and that after-acquired real estate shall pass by a general devise, would soon call for a judicial decision, whether such prior wills where the testator died after the act came into operation, were within its purview.

The first case which occurred was decided in October 1836, at Pittsburgh, by Judge Kennedy, and is Mullen v. McKelvy, 5 Watts 399. It was there held, that the execution of the will must be established by the evidence required by the law as it was when it was executed, and not as it was at the death of the testator. The question was argued by the present chief justice and the late Mr. Forward, who cited most of the authorities I have already stated under the English mortmain act. In this case the will was made before the Act of 1833, but the testator died afterwards, and the law as above stated was admitted on both sides. This disposed of the sixth section of the act requiring the signature of the testator at the end as inapplicable to the prior wills.

The next case was a year later at Pittsburgh, and was Murry v. Murry, 6 Watts 353, in which Chief Justice Gibson delivered the opinion of the court. The paper propounded as a will, was made or written by the decedent before 1833, and he died in September 1835. It was not signed by the decedent at the end, but the chief justice held, as it was written before the statute, it must be governed by the old law, and examining it in that light, he came to the conclusion that it was an unfinished paper and not a will.

"We are clear," says he, "that the statute operates only on wills written subsequently; but under the law as it stood, the paper in contest is destitute of the necessary proof of authenticity."

In Lewis v. Lewis, 2 W. & S. 455, decided at Philadelphia, in December 1841, the will was dated July 18th 1828, to which there was a codicil, dated December 15th 1833, and both were in the handwriting of the testator and signed by him. On the margin of the will was written the word "obsolete," also in the handwriting of the testator, who died in 1837. Sergeant, J., put the question in this form: "If the word obsolete was written before the codicil, the latter annuls the alleged revoca-

tion and revives the will, and if written afterwards it comes within the purview of the Act of 1833, and is not a revocation within the meaning of any of its provisions."

Mullock *v.* Souder, 5 W. & S. 198, was decided in Philadelphia, in March 1843, Judge Sergeant delivering the opinion of the court. There the will was dated 3d June 1831, and the testatrix died on the 7th July 1837, and her will was proved in Baltimore on the 10th of the same month, and on the 17th letters testamentary were issued, upon an exemplification filed in the register's office for the city and county of Philadelphia, to Caspar Souder, the executor. After the date of the will, the testatrix disposed of two messuages and lots which she owned, one in the city and one in the county of Philadelphia, and reserved to herself and her heirs two annual ground-rents; and the question was whether these ground-rents passed by the will. She did not republish her will.

It had been decided in Skerrett *v.* Burd, 1 Whart. 246, that ground-rents reserved from property sold after the date of a will, were after-acquired real estate, which of course did not pass by will prior to the Act of 1833. The broad question was therefore presented to the court, whether this will was to be governed by that act, the existing law at the death of the testatrix, or by the law as it stood when she executed her will. It was a subject the whole court was familiar with, and three of its members had given opinions upon branches of this subject. Judge Sergeant answers this question by saying that the act does not apply to a will dated before its passage, where the testator died subsequently. " We think, however," says he, " that it does not. It could only do so by giving the act a retroactive effect, which will never be done, when such does not expressly appear to be the design of the legislature, but the Act of Assembly will be left to operate on wills made and executed after the act comes into operation." After quoting most of the decisions on the mortmain act, used in the cases of 5 and 6 Watts, and which I have stated more at large, he uses this language: " There, the application of the statute" (of mortmain) " would have abridged the right of the devisee; here, it" (of 1833) " would abridge the rights of the heirs: and there seems no difference in principle."

This was undoubtedly the deliberate opinion of the whole court, and was entirely in consonance with all the previous decisions, and was a necessary corollary from them.

In Campbell *v.* Jamison, 8 Barr 498 (Harrisburg 1848), the testator made his will in 1827, republished it by parol declarations after 1833, and died in 1841. Coulter, J., delivering the opinion of the court, said, " That a will may be republished by parol, was distinctly decided in the case of Jones *v.* Hartly, 2 Whart. 103. The same point was ruled in 3 Wash. C. C. R.

[Gable's Executors *v.* Daub.]

481.    There is nothing in the Act of 1833.to interdict such republication by parol."

In Martindale *v.* Warner, 3 Harris 471, decided at Philadelphia, in December 1850, Judge Rodgers delivering the opinion of the court on the construction of the Act of the 6th May 1844, in relation to a devise or legacy ·in favour of a brother or sister of the testator not leaving any lineal descendants—not lapsing by reason of the death of such devisee or legatee in the lifetime of the testator—if such devisee or legatee shall leave issue surviving the testator, says, "In the case in hand, the will was executed before the Act of the 6th May 1844, but the testator died after the passage of that act.    The question is, did the legislature intend that the act should operate on wills executed before its passage, the death happening after, so as to change by the construction the legal intention of the testator?    For I agree if this intention clearly appear, it must be so construed: it would interfere with no vested right, as the testator is saved the power of directing otherwise.    It however strikes me that the intention must be most clearly expressed in language which it is difficult to misapprehend; and such is the doctrine held in Mullock *v.* Souder, 5 W. & S. 198.    Mr. Justice Sergeant says, "a retroactive effect will not be given to ·a statute, unless such appears expressly to be the design of the legislature.    Mullock *v.* Souder, it is true, is the case of real estate, and as this is assumed to be personal property, it does not in terms rule this case, nor is it in this case cited for that purpose, but for the sake of the principle decided, which is as applicable to personal as real estate.    Nothing appears, but rather the reverse, in the Act of 1844, indicating any intention to give it a retrospective effect.    No devise or legacy *hereafter made*, is the phraseology of the act, thereby meaning, according to the usual acceptation of language, wills made and executed after the passage of the act."    After discussing the will of personal property, including *ex necessitate*, all the testator had at his death, and the legatee intended when the will was made, and granting the constitutional power of the legislature, he says: "but is it going too far to require that such intention shall be expressed in such clear, unambiguous terms as to preclude all hesitation and doubt?    It is, in my judgment, giving the act a retroactive effect, which, as is ruled in the case cited, Mullock *v.* Souder, will not be permitted, unless such appears expressly to be the design of the legislature.    Though a will, it is true, does not take effect till after the testator's death, yet it is inchoate, though not consummate from the execution of it, and, for many purposes in law, of which this is one, it relates to the time of making it."

In Kurtz *v.* Saylor, 8 Harris 205 (1852), C. J. Black said, "she" (meaning a married woman) "had no such authority by

4 WR.—15

[Gable's Executors *v.* Daub.]

the act of 1848, because it was not then passed, and her right
to make a will is to be determined by the law as it stood then,
and not by the statutes in force at the time of her death. This
is decided in Mullen *v.* McKelvy, 5 Watts 399. See, also,
Dwarris on Statutes 685.

"4. We must therefore fall back upon the Act of 1833, the
only one which was in force at the date of the will, and this act
in sect. 3 provides that a married woman may, by the assent or
license of her husband, dispose of her personal estate by will."

The case of Jack *v.* Shoenberger deserves particular attention.
That was an action of ejectment, in which there was a will made
on the 19th of September 1828, and land acquired afterwards
between 1831 and 1837, and an alleged parol republication of
the will after the purchase by the testator, who died seised of it
in 1843. On the first trial in the Common Pleas of Westmore-
land county, evidence of the parol republication was admitted,
and there was a verdict for the defendants, who claimed under
the will as republished, the after-purchased land which was the
subject-matter of the suit.

A writ of error was taken to the Supreme Court, and on the
17th of November 1851, Chief Justice Gibson delivered the
opinion of the court, which was not reported, reversing the judg-
ment of the court below, upon the ground that the will was within
the Act of 1833, which prohibited parol republication by a proper
construction of the 6th and 13th sections. It is said, that this
was only the opinion of three judges, Judge Bell dissenting, and
Judge Coulter, whose opinion in favour of parol republication
was well known, taking no part in the decision, in consequence
of having been the legal adviser of the testator. Upon a second
trial, evidence of a parol republication was rejected by the court,
and upon this another writ of error was taken, and argued and
decided at the Pittsburgh Term 1853, my brother Woodward
delivering the opinion of the court, in which he discusses two
propositions: 1st. Whether there was not error in rejecting the
parol evidence: 2d. If the will was under the Act of 1833,
whether the 10th section did not reach the case before the
court.

"We entertain," says the learned judge, "for it (the opinion
of the court) all the respect which is due to the distinguished
judges who preceded us on this bench, and if a majority of this
court as now constituted, cannot acquiesce in the conclusions of
its learned author, it is not for want of a careful consideration
of the reasons advanced in support of those conclusions. There
is nothing in our office more pleasant than to follow in the path
illuminated by that great intellect, but we are sometimes com-
pelled to depart from it, in order to get back upon the beaten
track of the law.

[Gable's Executors v. Daub.]

"When Matthew Jack, therefore, made this will, it was capable of republication by parol, and had he subsequently made another will, with all due solemnities, it might have been superseded by a parol republication of this one." "They offered to prove such republication, but according to the opinion of Chief Justice Gibson, it may not be done, because our Act of 1833, like the statute of 29 Charles II., has cut up parol republications, and this will is within the purview of the act, because the testator died after the act was passed. These are the propositions that ruled this case, and it is apprehended that if both were admitted, the judgment was improperly reversed."

"It is doubtful whether the legislature meant more by the 13th section of the Act of 1833, than to re-enact the 6th section of the Act of 1705, and if this were all, the established construction would require us to say, that it does not prevent parol republication: Campbell v. Jamison, 8 Barr 498. But this point is not worth discussing, for we think Judge Gibson fell into error when he ruled that this will was within the Act of 1833. If that act is not the law of *this* will, then it is immaterial whether the 13th section was intended as a re-enactment of the 6th section of the Act of 1705, or as an introduction of the 6th section of the Statute of 29 Charles II. Is then this will within the purview of the Act of 1833?"

And here it may be proper to introduce the remarks of the revisers, on the 13th and 14th sections of the Act of 1833, to show it was not their intention to do more than to copy the provisions of the Act of 1705, with the verbal alteration extending them to real as well as personal estate, so as to conform to the settled construction of the act.

"Section 13th," say the revisers: "The thirteenth section is nearly a literal transcript from the Act of 1705, excepting that in the latter, the provision is confined to wills of *personal* estate, probably, as we have already suggested, from inadvertence. In this section it is confined to *real* estate."

"Section 14th. The fourteenth section relates to the revocation of wills of personal property, and contains no material alteration of the present law."

After observing on the cases of Mullen v. McKelvy, and Murry v. Murry, Judge Woodward says, "where a man republishes his will, the terms and words of the will are construed to speak with regard to the property the testator is seised of, and the persons named therein at the date of republication, just the same as if he had had such additional property, or such persons had been *in esse* at the time of making his will."

"If a will made in 1828, be held within the purview of the Act of 1833, we give this act a retrospective effect, which is never done, except on the clearest evidence of legislative intention;

[Gable's Executors *v.* Daub.]

and hence in Mullock *v.* Souder, 5 W. & S. 198, this court refused to apply the 10th section of the act to a will made before its passage. 'It could only so apply,' says Mr. Justice Sergeant, 'by giving the act a retroactive effect, which will never be done where such does not appear expressly to be the design of the legislature, *but the act will be left to operate on wills made and executed after the act comes into operation;*' and let it be remarked, that this was said in reference, not to the formalities of execution, which in Mullen *v.* McKelvy, it was admitted, must be according to the law as it stood at the date of the will, but in reference to the construction of the act as a rule of property."

"We cannot understand how, in view of these authorities, it was decided that this will was to be governed by the Act of 1833; Judge Gibson gives no reason, except that the testator died after the act which we have seen was considered of no importance in Mullen *v.* McKelvy, and he cites no authority."

"Unsupported by authority, and in direct conflict with those to which we have referred, the opinion of Judge Gibson comes to us with something less than a binding obligation. Neither the maxim of *stare decisis*, nor the unfeigned respect entertained for our predecessor, nor our great reluctance to disturb the judgment in this very case, are reasons for standing to an opinion which was in itself a departure from the course of decision. We are therefore of opinion that this will is not within the purview of the Act of 1833, but is to be governed by the law as it was settled before that enactment, and that consequently the evidence of parol republication was improperly rejected."

Judge Woodward then takes the other horn of the dilemma, and shows clearly that if the will was to be construed as within the Act of 1833, the 10th section, of course, applied to it, and the general devise passed the after-acquired real estate, the subject-matter of this suit.

"So far," says he, "from manifestation of such intention" (that it should not pass by that general devise), "the words 'rest and residue of my estate) whether real or personal, and everything at time of death I may be possessed of,' import a plain intention to pass whatever he might acquire, as well as what he then had."

"Either way, the plaintiff in error would be entitled to hold the land."

"That we may not be understood as deciding more than we intend, it is proper to add, that we have not considered whether the evidence offered would amount to proof of republication. That it tended to prove it is apparent, and therefore it was competent. The fact having been once found by a jury, and the evidence offered having been rejected, we are bound, perhaps, to

presume that it would again have been found had the evidence
been received."

The cause was therefore sent down again with what amounted
to an instruction to receive the parol evidence of republication.

This case came up incidentally in the case of Mrs. Fransen's
will. There the will of a single woman, executed since the Acts
of 1833 and 1848, but who afterwards married and died, was
attempted to be sustained by parol republication after marriage,
without any of the solemnities required for its original execution
under the Married Woman's Act. It was argued that the 16th
section of the Act of 1833 was repealed by the Act of 1848,
and if it was not, still the parol republication, in the form it was
made, was sufficient. Upon both points the court, consisting of
C. J. Lewis and Justices Woodward and Knox, were against the
appellant. The case is reported in 2 Casey 202, and was decided
in the winter or spring of 1856.

In that case Mr. Justice Woodward thought his opinion, in 10
Harris, had been misapprehended, and he explained it, by show-
ing that his remarks did not apply to a will executed since the
Act of 1833. In Jack v. Shoenberger the will had been exe-
cuted prior to 1833, the parol republication and the death were
both after that period. Speaking of the law in such case, he
said: "In Campbell v. Jamison, 8 Barr 498, where a parol repub-
lication was sustained, the will had been executed before the Act
of 1833 was passed, and, like the case of Mullen v. McKelvy, 5
Watts 400, the execution of the will was to be judged of by the
law as it stood at the time of the execution. The execution of
the will in both those cases was under the old law, *which required
no signature*, and the right to republish by parol followed as a
necessary and legal sequence. *The testator died after the Act
of 1833 came into force*, but that statute *did not afford the rule
either of publication or republication*.

The result of the opinions on this entirely incidental question
was, that in the case of a will executed after the Act of 1833,
C. J. Lewis and Justice Knox held it might be republished by
parol, whilst Mr. Justice Woodward expressed a strong doubt
whether such a will, operating exclusively under that act, could
be republished by any act not having the signature of the tes-
tator at the end, as required, with regard to the original will
itself.

The cases of Price v. Taylor, 4 Casey 95, and Criley v. Cham-
berlin, 6 Id. 161, and Reinhart v. Lantz, 1 Wright 488, upon
the construction of the Act of 27th April 1855, in relation to
estates tail, do not bear upon the question now under considera-
tion. The two first simply declare that, in two wills made under
the Act of 1833, by which wills of real estate are placed upon
the same footing as wills of personal estate as to their relation

[Gable's Executors *v.* Daub.]

to the property in existence at the death of the testator, and where the testator died after the Act of 1855, estates tail in them were held created after the act, and of course became estates in fee simple. The last decision was that an estate tail, vested before the Act of 1855, was not affected by it.

The case of Mullock *v.* Souder, decided by this court eighteen years ago, in conformity with decisions of a kindred character in the preceding ten years, and confirmed in every case subsequently ruled by the same tribunal, therefore remains the settled law of the land, drawing a clear and distinct line between wills executed before and those executed after the Act of 1833, the former to be governed as to execution and construction by the old law, and the latter by the statutory enactment; and this was clearly the intention of the revisers and of the legislature, which adopted their bill, and made it a law. The same rule was adopted in England, in their Statute of Wills, in 1837, by which all wills executed before the 1st January 1838, are to be governed by the law as it stood, before the passage of the act of parliament. I have not examined the decisions of other states with a view to discuss them, as it is rarely profitable where our own course of decision has been settled by a contemporaneous exposition, constantly recognised by the highest judicial tribunal, and thus becoming a part of an Act of Assembly as much as the positive enactment of the English statute is a part of theirs.

Thus far we agree with the learned judge in the court below; but there is another point, which, though made in the argument, is not noticed by him, which appears to us to raise the real question in the cause depending on the doctrine of election.

This after-acquired real estate of her husband was sold by the testatrix, the widow of the deceased, as her own in her lifetime, and part of the price received by her, and the present suit is to enforce the payment of the balance. The title set up as a defence is, that this real estate descended to the heirs of Frederick Gable, and did not pass to his widow under his will. The answer to this claim is a very simple one. The purchase-money was $1600, of which she received $600, and three bonds, with warrants of attorney, were given to her by the defendant, on which judgments were entered in the Common Pleas of York county. The claimants are the heirs of her husband, who, by her will, take the half of her real and personal estate, including, of course, the whole of the purchase-money of $1600, whether in cash or bonds and judgments, and who of course must elect to take under or against the will, and it would appear by the proceedings in the Orphans' Court, that they have elected to take under the will, and of course their title passes to the defendant, and the executors are entitled to recover in this suit.

The words of the will of Frederick Gable were large enough

[Gable's Executors v. Daub.]

to include after-acquired real estate : " Item—I give, devise, and bequeath unto my dear wife Fronica (Veronica), all that remainder of my personal estate, also all that my real estate, consisting of houses, land, and plantations, being the same whatsoever and wheresoever situate in the county of York and elsewhere, that I shall die owner of or possessed, or in my right to have and to hold, all that my real and personal estate, unto my dear wife Fronica (Veronica), to her sole use, benefit, and behoof, and to her heirs and assigns for ever."

If, therefore, the heirs of the husband abide by their election, or elect to take under the will of the testatrix, then the plaintiffs below are entitled to recover in this suit. But as it will be necessary to find certain facts which are not settled by the case stated, we cannot, nor can the court below, enter a proper judgment, without those facts being found by a jury, or settled by the agreement of the parties.

The judgment is therefore reversed, and a *venire de novo* awarded.