# ESTATE OF MARY U. QUIN, IN TRUST.

## ESTATE OF FRANCIS FUNK, DECEASED.

APPEAL BY REAL ESTATE TRUST CO., TRUSTEE, FROM THE
ORPHANS' COURT OF PHILADELPHIA COUNTY.

Argued March 27, 1891—Decided October 26, 1891.
[To be reported.]

1. The general doctrine upon which trusts for the separate use of married
women rests in Pennsylvania, is essentially different from that prevail-
ing in England; its peculiarity being founded on the particular purpose
to be accomplished, to wit, the protection of the feme-covert from her
own improvidence, and the improvidence and importunity of her hus-
band: McConnell v. Lindsay, 131 Pa. 476.

2. In Pennsylvania, a separate use can be created only for the benefit of a
woman actually married, or in immediate contemplation of marriage
with a particular person, at the creation of the trust; and, although
effectual as respects the first marriage, it will not revive for her protec-
tion under a second marriage : The decisions on this subject reviewed,
per Mr. Justice CLARK.

3. When a testator attempts by his will to create such a trust, his power
to do so must be determined as of the date of the execution of the
will, notwithstanding it does not go into effect until his death; if the
woman be then neither married nor in immediate contemplation of mar-
riage, the trust will be invalid, and her subsequent marriage, in the
testator's lifetime, will not render it valid : Neale's App., 104 Pa. 214.

4. This rule is unaffected by the act of June 4, 1879, P. L. 88, providing
that wills shall be construed with reference to the property comprised
therein, "to speak and take effect as if executed immediately before
the testator's death," etc.; since that act, as before, the power or
capacity of the testator, and the legality of his disposition of his estate,
must be determined as of the date of the will.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WIL-
LIAMS, McCOLLUM and MITCHELL, JJ.

No. 126 January Term 1891, ~~ ~~ court below, No. 389
April Term 1887, O. C.

On June 30, 1890, the account of the Real Estate Trust
Company of Philadelphia, substituted trustee for Mary U.
Quin and her children, under the will of Francis Funk, de-
ceased, was called for audit before FERGUSON, J., when the
following facts were shown:

Statement of Facts.

Francis Funk, the decedent, made and executed his last will and testament on May 27, 1872, whereby, after directing the payment of his debts and funeral expenses, he devised and bequeathed the residue and remainder of his estate to his executors, upon the following trusts, to wit: (a) to collect the income and pay over the same from time to time to his wife Mariana, during her widowhood, for the support and maintenance of herself and the testator's daughter, Mary Ulrica Funk, so long as said daughter should remain single, provided she should give willing and reasonable assistance to her mother; and for the education and maintenance of the testator's two sons, Francis B. and Frederick M. Funk; (b) from and after the decease or termination of the widowhood of said wife, to expend so much of the income as might be necessary to complete the education of said two sons, and to maintain them until they should become able to maintain themselves; and to pay one fourth of said income to said Mary Ulrica, so long as she should remain unmarried, and to pay to another daughter, Ella Z. Fourgeray, the remaining unexpended income, provided it should not amount to more than one fourth of the whole income; (c) in case of the marriage of said Mary Ulrica, to pay to each of the daughters one half of the income remaining after making the necessary expenditures for the education and support of the sons, the amount so to be paid to each of the daughters not to exceed the one fourth of the entire income, and the same not to be in anywise "subject to the control of their respective husbands, or be in any way or manner liable for their debts;" and (d), when the youngest child should have completed his education and be able to maintain himself, to pay over to each of the children of the testator an equal portion of the income of the estate until such youngest child should attain his twenty-first year. The will then continued:

"Whereupon, I order my estate to be divided into four equal parts, each of said parts to contain, as near as may be, an equal fourth part of each kind of investment forming a part of my estate. Each of my children shall receive thereafter, annually, the interest arising from one of said equal parts, but as each of my daughters completes her thirtieth year, and each of my sons completes his twenty-fifth year, they shall respectively have paid to them the principal of her or his respective share

of my estate, the principal of the shares of my said daughters to be so conveyed or secured to them that the same shall be free from the control of their husbands, and not to be liable to their debts.

" And in case any of my said children should die before receiving the principal of her or his share of my estate, but leaving issue to survive her or him, then the principal as .well as the income of the share of her or him, so dying, shall go to her or his issue, but in case of no issue, then such principal and income shall be paid to her or his surviving brothers and sisters in equal parts.

" Item. It is my wish that so long as my daughter Mary Ulrica remains unmarried, she and my sons shall keep house together if mutually agreeable to all of them so to do."

At the date of the will, Mary Ulrica Funk was unmarried and had no marriage in contemplation. In 1873, she made the acquaintance of A. J. Quin, her present husband, a lieutenant in the 6th regiment Horse Guards, British Army, who first visited this country in that year; and, in April, 1875, she was married to him. At the time of the audit she was forty years of age.

The testator did not die until September 6, 1886. His wife died before him, as did also his son Francis, the latter being unmarried and without issue. The two daughters named in the will, and the other son, Frederick, survived him.

Upon the adjudication of the account of the testator's executors the estate was divided into three parts, one of which was awarded to the surviving son, then over twenty-five years of age. The other two parts were awarded to a trustee, to be appointed for the daughters under the will, each of them being then over thirty years of age. Upon petition of the daughters, the accountant was then appointed trustee for each of them, and received the shares so awarded for their benefit. Subsequently, Mrs. Fourgeray's husband died; whereupon the Orphans' Court declared the trust for her benefit at an end, and awarded to her the principal of the trust fund held for her benefit. The fund in the hands of the accountant, held by it for the benefit of Mrs. Mary U. Quin, was claimed by her upon the ground that the trust, under which it was held, was void.

The auditing judge, citing Neale's App., 104 Pa. 214, and

Hildeburn's Est., 8 Pa. C. C. R. 369, and holding that, as the marriage of the cestui que trust to Lieutenant Quin could not have been in contemplation at the date of the will creating the trust, and no other reason existed for maintaining the trust, it should be considered as at an end, awarded to her absolutely the entire fund in the hands of the accountant.

Exceptions to the adjudication having been filed, the court, ASHMAN, J., on November 1, 1890, filed an opinion citing Neale's App., 104 Pa. 214; Hamersley v. Smith, 4 Wh. 126; Wells v. McCall, 64 Pa. 214; Snyder's App., 92 Pa. 504; Tullett v. Armstrong, 4 Myl. & Cr. 405; MacConnell v. Lindsay, 131 Pa. 490; and dismissed the exceptions, PENROSE, J., filing a dissenting opinion: See Funk's Est., 27 W. N. 473; s. c. 9 Pa. C. C. R. 113.

Thereupon, the trustee took this appeal, specifying that the court erred in holding that the trust was void and at an end, and in awarding to Mary U. Quin the whole trust-estate.

*Mr. George Junkin*, for the appellant:

If Neale's App., 104 Pa. 214, is the law of this state, the court below did not err in this case. But, ought not this court to overrule Neale's Appeal, as it did Kuhn v. Newman, 26 Pa. 227, and other cases which might be cited?

1. In Smith v. Starr, 3 Wh. 62, the only point decided was that when the cestui que trust becomes discovert, the restraints of the separate-use trust cease. The case did not decide that the coverture must exist, or the particular marriage be in contemplation at the date of the will or at the death of the testator, and the significant language used by Mr. Justice ROGERS indicates the contrary. Hamersley v. Smith, 4 Wh. 126, decided nothing more than the same point, and the additional one that a second marriage, after the testator's death, did not revive the trust. The will there considered contained no words looking to a second marriage. In Wells v. McCall, 64 Pa. 207, and Springer v. Arundel, 64 Pa. 218, the trusts were upheld, and in the latter case it was held that the creation of the trust, followed in a short time by the marriage, was proof that the fact of the marriage was in the testator's contemplation.

2. In none of these cases is it held that the trust will be void when the marriage actually exists at the testator's death,

though not at the date of the will.   This is held for the first
time in Neale's App., supra, and the reasoning of the opinion
does not justify the conclusion.   A will is ambulatory until
the testator dies.   It has always been considered to speak from
his death.   When Francis Funk died, as his daughter was then
married he unquestionably had the·power to do the very thing
he did by his will.   Had he republished it the day before he
died, the trust would have been valid beyond question.   To
hold that the fact of his not formally republishing it defeats
the trust, then absolutely within his power to create, is a
very narrow and refined view to take of the matter, and to
hold the trust good in such circumstances would violate no
rule of law and interfere with no vested rights.

3. All through the will, which is inartificially drawn and
probably by the testator himself, runs the thought that his
daughters should be protected from their husbands.   Both of
them were married at his death, and no doubt he died believ-
ing that his will had protected them.   Why should it be de-
clared abortive for want of republication ?   Wherever a person
has the legal right to dispose of property, and means to do so,
the form of the instrument adopted for the purpose, if at law
ineffectual, will be disregarded, and it will be reformed so as
to be made effectual: Lant's App., 95 Pa. 283 ; Fidelity Co.'s
App., 121 Pa. 17 ; Bond v. Bunting, 78 Pa. 219 ; Madeira's
App., 17 W. N. 202.   The decision in Neale's App., supra, is a
clear violation of the right of every man to bequeath his estate
just as he pleases.   As to the propriety of upholding such
trusts, see : Peoples' S. Bank v. Denig, 131 Pa. 255.

*Mr. Frank L. Lyle,* for the appellee :

1. The principle that a separate use for a married woman
cannot be sustained unless she is covert or in immediate contem-
plation of marriage, is too firmly incorporated in our law to be
questioned now: Hamersley v. Smith, 4 ·Wh. 126 ; McBride
v. Smyth, 54 Pa. 245 ; Wells v. McCall, 64 Pa. 207 ; Snyder's
App., 92 Pa. 504 ; Phila. Trust Co.'s App., 93 Pa. 209 ; Neale's
App., 104 Pa. 214.   In the present case, when the will was
executed Mary Ulrica Funk was neither married nor in con-
templation of marriage.   This appears affirmatively by proof,
and the language used by the testator in different parts of his

will demonstrates, beyond a doubt, that while he regarded her marriage as a possibility, he did not consider it as probable, and certainly not as " in immediate contemplation."

2. The situation at the time of executing the will controls the status and authority of the parties: Neale's App., 104 Pa. 214. The application of that decision to this case does not violate the right of the testator to dispose of his estate as he pleases, for in his attempted disposition he violates an express rule of law. The appellant claims that, as the will was ambulatory until his death, the facts existing at that time are to determine its operation. Such is not the law: Girard v. Philadelphia, 4 R. 336; Martindale v. Warner, 15 Pa. 471; Taylor v. Mitchell, 57 Pa. 212; Kurtz v. Saylor, 20 Pa. 205; Gable v. Daub, 40 Pa. 217. In the fourteen years which elapsed between the making of this will and the death of the testator, the appellee might have contracted a second or even a third marriage, and, according to the appellant's contention, the trust would still be binding. This is contrary to all the authorities.

3. The right to republish a will by parol has not been judicially determined: Broe v. Boyle, 108 Pa. 82. But, in this case, there is no evidence of republication. To permit the mere retention of a will, even after the happening of an event contemplated by it, to operate as a republication, would revolutionize the law. The principle of Lant's App., 95 Pa. 279, cannot be invoked, as the form of the instrument adopted in the present instance was effectual at law for the purpose intended, and the difficulty was a lack of legal power in the testator. Equity will not reform an instrument inoperative for lack of authority in the testator, he having failed to complete it when the power was afterwards acquired. Every intendment from his failure so to do is to be taken in favor of the appellee. Besides, the consideration and circumstances which justified the reformation in Lant's Appeal, are wanting here.

Opinion, Mr. Justice Clark:

The facts of this case, as they are stated in the paper-books, are, substantially, as follows: The last will and testament of Francis Funk, deceased, was executed May 27, 1872; at that

time, he had a wife; two sons, Francis and Frederick; a married daughter, Mrs. Fourgeray, and an unmarried daughter, Mary U. Funk, the appellee. A. J. Quin, who was a lieutenant in the British army until 1873, in that year visited this country, and then first made the acquaintance of Mary U. Funk, who became his wife in 1875.

Francis Funk, the testator, did not die until September 6, 1886; his wife and his son Francis died some years before. He left to survive him, therefore, only one son and the two daughters before mentioned. By his last will and testament, already referred to, he first provided for the payment of his debts and funeral expenses, and gave the residue of his estate to his executors, in trust: first, to pay the net income of the whole of his estate to his wife during widowhood, for the support of herself and daughter Mary U. as long as she remained single, provided she assisted her mother; and for the education and maintenance of the two sons until they became self-supporting; second, at the termination of the widowhood of his wife, (*a*) to expend so much as might be necessary for the education and maintenance of his two sons until they became self-supporting; (*b*) to pay to Mary U. one fourth of the net income of the estate so long as she remains unmarried; (*c*) to pay to his daughter Ella Z. Fourgeray the unexpended balance of the income, provided it did not exceed one fourth of the whole income. Then follows this clause:

"And, in case of the marriage of my said daughter Mary, then, from that time, to pay over unto each of my said daughters an equal half part of the income which may remain after the necessary amounts expended for the education and support of my said sons: provided, however, that the income to be paid to each one of my said daughters shall not exceed one fourth part of the whole net income of my estate; and provided, also, that the same shall not in any wise be subject to the control of their respective husbands, or be in any way or manner liable for their debts. And from and after the time that my youngest child has completed his education, and is also able to maintain himself, then in trust to pay over unto each of my children an equal portion of the income of my estate, until such youngest child shall attain his twenty-first year of age; whereupon I order my estate to be divided into four equal parts, each of said

Opinion of the Court.

parts to contain, as near as may be, an equal fourth part of each kind of investment forming a part of my estate. Each of my children shall receive thereafter, annually, the interest arising from one of said equal parts, but as each of my daughters completes her thirtieth year, and each of my sons completes his twenty-fifth year, they shall respectively have paid to them the principal of her or his respective share of my estate, the principal of the shares of my said daughters to be so conveyed or secured to them that the same shall be free from the control of their husbands, and not to be liable to their debts."

In case either of his children should die leaving no child to survive, that share was to go to the surviving children under the will.

Upon the adjudication of the account of the executors of Francis Funk, the estate was divided into three parts, one of which was awarded to the surviving son, he then being over twenty-five years of age; and the shares of the daughters were awarded to the trustee to be appointed for them under the will, both being over thirty years of age. Upon their petition the Real Estate Trust Company of Philadelphia was appointed trustee for each daughter, and received each of their shares thus awarded for their benefit. Mrs. Fourgeray's husband having since then died, the Orphans' Court declared the trust at an end, and awarded to her the capital of her trust-estate, and it has been paid to her. The Real Estate Trust Company having filed an account in the Orphans Court, Mrs. Quin contended that, as at the execution of the will she was neither a married woman nor in immediate contemplation of marriage, the trust as to her was executed, and she was entitled to have the fund awarded to her absolutely, free from any control or claim on the part of the trustee. The Orphans' Court accepted this view of the case, and awarded the fund to Mrs. Quin.

It is conceded that Mrs. Quin, at the time of the making of the will, was a single woman, and that the marriage relation which was subsequently formed was not then in contemplation; but it is contended on the part of the appellant that, as she was a married woman when the will took effect at the death of her father, in 1886, the trust for her separate use was operative and effectual for the purposes set forth in the will, and that the trust should have been sustained. This is the only

question for our consideration; and it is admitted by the appellant that, if Neale's App., 104 Pa. 214, was rightly decided, it governs this case, for the question involved in the case at bar was there clearly decided.

The rules of equity which govern in the creation of a separate use, and which define its nature and effect in Pennsylvania, are and always have been widely different from those which prevail in England and in many of the states. It was at first decided in Massey v. Parker, 2 Myl. & K. 174, that a separate use created for the benefit of a single woman would not, upon her marriage, debar her husband from his marital rights; but subsequently, in Tullett v. Armstrong, 4 Myl. & C. 377, a different doctrine was declared. It was there held that a valid separate use could be created for the benefit of a single woman, which would come into operation at her marriage whenever it should occur; and, further, that, if the exclusion of any future husband was in contemplation, this intention would be carried into effect, but, if the separate use was intended to be confined to a particular marriage, a second husband would not be excluded from his marital rights. The question in each case under the English rule is, what was the intention of the settlement or will? Lewin on Trusts, 758. Under the English rule, if the feme sole chooses to make any disposition of the property before coverture, she may do so. She has the option of determining the trust at any time before coverture; but, if she does not, it will attach on the first or any subsequent marriage, according to the terms of the will or other mode of settlement. And even after coverture, unless her power of anticipation be restrained, the feme covert may, in general, deal with the property precisely as if she were feme sole. "A feme covert, acting with respect to her separate property," says Lord THURLOW in Hulme v. Tenant, 1 Brown C. C. 20, " is competent to act in all respects as if she were a feme sole." Upon this ground, it has been determined that if, without any direct or express reference to her separate property, a feme covert, who has property settled to her separate use, professes to bind herself by any written instrument, the implication of law is that she meant to charge her separate estate, for, except with reference to that, the instrument was without meaning and nugatory. Thus, if a feme covert execute a bond,

even to her husband, or join in a bond with another, even with her husband, or sign a promissory note or bill of exchange, or give a guaranty, though she is not personally bound, yet her separate estate, if anticipation be not restrained, is · liable: Lewin on Trusts, 942. She is liable, also, through her separate estate, for any general engagement made with reference to and upon the faith or credit of that state: Idem, 761-767. But in Pennsylvania, Rhode Island, North and South Carolina, and in others of the states, following the case of Massey v. Parker, supra, a different doctrine has been declared. In this state, a separate use can only be created for the benefit of a woman actually married, or in immediate contemplation of marriage; and, although effectual as respects the first marriage, it will not revive for her protection under a second marriage: Wells v. McCall, 64 Pa. 207; Yarnall's App., 70 Pa. 239; Snyder's App., 92 Pa. 504. It is equally well settled, in this state, that a feme covert has only those powers over her separate estate, which are actually and expressly conferred by the settlement or will: Lancaster v. Dolan, 1 R. 236.

It must be observed that the general doctrine upon which this separate estate of the wife rests in this state and the other states named, is essentially different from that prevailing in England. It is peculiar; its peculiarity, as we said in Mac-Connell v. Lindsay, 131 Pa. 476, being founded on the particular purpose intended to be accomplished. In England and in many of the states, the rule, as we have said, is to treat the wife as the absolute owner, possessing the jus disponendi and the incidental power of charging the estate with her debts, as if she were a feme sole; whereas in Pennsylvania, this estate in equity was intended, through her disabilities, to protect the feme covert not only from her own improvidence, but also from the improvidence and importunity of her husband. As early as 1829, in the case of Lancaster v. Dolan, 1 R. 231, it was distinctly held that a feme covert is, in respect to her separate estate, to be deemed a feme sole only to the extent of the powers clearly given by the instrument by which the estate is settled, and that she had no right of disposition beyond that. "Instead of holding the wife to be a feme sole to all intents as regards her separate estate," says Chief Justice GIBSON in that case, "she ought to be deemed so only to the extent of the

powers clearly given in the conveyance; and that, instead of
maintaining that she has an absolute right of disposition un-
less she is expressly restrained, the converse of the proposition
ought to be established, that she has no power but what is
expressly given." This case was followed by Thomas v. Fol-
well, 2 Wh. 11, where it was declared to be the settled law of
Pennsylvania that a married woman possesses no power, in
respect of her separate estate, but what is positively given or
reserved to her in the instrument by which the trust is created.
That this was an intentional departure from the known English
rule, is apparent from the language of Chief Justice GIBSON,
who, in delivering the opinion of the court, said: " Why is a
settlement ever made? Certainly to exclude the husband's
control. But, to exclude his direct control, which consists in
the exercise of legal power, and yet leave him the means of
giving the effect to indirect control, which consists in the ex-
ercise of personal influence, is to do nothing. We daily see
the incompatibility of the wife's protection with the qualified
power of alienation given her by our statutes; and the Eng-
lish chancery reports show that the same mischief has ensued
from the alienations allowed her under deeds of settlement, by
reason of which what would otherwise have kept the wolf from
the door has been wasted or pirated by the husband. We
therefore hold it to be the settled law of Pennsylvania that,
instead of her having every power for which she is not nega-
tively debarred in the conveyance, she shall be deemed to have
none except what is positively given or reserved to her."
The rule declared in Lancaster v. Dolan has been steadily
adhered to in a long line of cases; too long to justify a refer-
ence to all of them here. The following cases, however, may
be cited: Dorrance v. Scott, 3 Wh. 316; Wallace v. Coston,
9 Wh. 137; Stahl v. Crouse, 1 Pa. 111; Rogers v. Smith, 4
Pa. 93; Penna. Co. v. Foster, 35 Pa. 134; Wright v. Brown,
44 Pa. 224; McMullin v. Beatty, 56 Pa. 389; MacConnell v.
Lindsay, 131 Pa. 476. If anything in the law may be regarded
as settled, it is that a feme covert, as to her separate estate,
has no power of disposition beyond what is conferred upon
her in the instrument creating the trust.

In Maurer's App., 86 Pa. 380, a case involving this precise
question, Mr. Justice SHARSWOOD says: " It is too late to shake

the authority of Lancaster v. Dolan, 1 R. 232.    Whether the
decision in that case was right or wrong, it has been so often
recognized and affirmed, since 1829, that it is now one of the
most firmly established rules of practice in this state."

But, as restraints upon alienation are repugnant to the gen-
eral policy of the law, it became necessary to restrict the opera-
tion of the rule; in other words, the peculiarity of our system,
as declared in Lancaster v. Dolan, called for a corresponding
rule, confining its operation to a more restricted class of persons;
for, if a separate estate might be settled upon every single
woman, the free alienation of property and transmission of titles
would thereby be most seriously embarrassed.    Hence, in Smith
v. Starr, 3 Wh. 62, it was held that, if a married woman having
a separate estate becomes discovert, the restraints upon the dis-
posal of the estate attaching during coverture cease to exist
when she becomes sui juris.    This case was followed by Ham-
ersley v. Smith, 4 Wh. 126, where Chief Justice GIBSON, in
the opinion of the court, said : " The point in contest was vir-
tually decided in Massey v. Parker, 2 Myl. & K. 174, where it
was settled that a restrictive settlement, by a gift to the sepa-
rate use of an unmarried woman, is an impracticable one; and
that it has no force to prevent her from giving the property to
a husband by the act of marriage, or disposing of it in the in-
terim. . . . . Perhaps it is not easy to discern the policy of a
rule which disables a benefactor from making a determinative
provision for his beneficiary which cannot be squandered or
reft from him; yet the law seems to be thus settled, not only
by the cases cited, but by Newton v. Reid, 4 Sim. 141, and
Woodmeston v. Walker, 2 Russ. & M. 197, in which the
principle was applied to an unmarried woman.    An apparent
exception to it is a gift to the separate use of a woman in con-
templation of her marriage with a particular person, which, by
force of the agreement implied by his assent, constitutes a fu-
ture separate use during the particular coverture, but which,
in reality, is no exception at all. . . . . Admitting the sound-
ness of the principle that there cannot be a restraint which is
repugnant to a gift, it is impossible to doubt the correctness of
the decision in Massey v. Parker, which is in accordance with
it.    Now, the difference betwixt that case and the present is
that here the feme was married at the time of the gift, and there

she was not; but the effect of it is only that she had in our case an unquestionable separate use during the first coverture." These cases were followed and re-affirmed in Harrison v. Brolaskey, 20 Pa. 299; Steacy v. Rice, 27 Pa. 75; Bush's App., 33 Pa. 85; McKee v. McKinley, 33 Pa. 92; Nice's App., 50 Pa. 143; Freyvogle v. Hughes, 56 Pa. 228; Koenig's App., 57 Pa. 352. The same rule obtains whether the exclusion of the husband's marital rights refer to a particular marriage or to a second or any future marriage; for, it has been uniformly held, as intimated in Hamersley v. Smith, supra, that a separate use can only be accorded for the benefit of a woman married, or in contemplation of marriage with a particular person; and certainly neither a married woman, nor one in contemplation of a particular marriage, could be supposed to have in view a second or other marriage.

The same doctrine is reasserted in McBride v. Smyth, 54 Pa. 245. Mr. Justice STRONG says: " Whatever may be the rule in the English courts, it is too well settled to be disturbed by anything else than a legislative enactment, that a separate use for a woman cannot be created unless she is covert, or unless in immediate contemplation of her marriage;" citing Potts's App., 30 Pa. 168; Dubs v. Dubs, 31 Pa. 149. " We take it, therefore, as settled," says Mr. Justice AGNEW in Wells v. McCall, 64 Pa. 207, " that the trust will be supported notwithstanding the cestui que trust is a feme sole at its creation, provided that it be done in immediate contemplation of marriage. This leads us to inquire what is meant by an immediate contemplation of marriage. Evidently the expression means in contemplation of an immediate marriage; one presently in view of the donor, and to take place in a short time after the instrument is to take effect; in contemplation of marriage with a particular person, says GIBSON, C. J., in Hamersley v. Smith, supra. That the marriage must be in immediate view at the time of the creation of the trust, is proved by all the cases which decide that on the termination of the coverture the trust falls and is not revived by a second marriage; for, if any marriage would answer to the provision for the trust, a second would as well as the first. But a second marriage is evidently a thing not in immediate contemplation, being cut off from view by the uncertainties of a first marriage, the death

of the husband, and an intention to marry a second time."
To the same effect is Springer v. Arundel, 64 Pa. 218; Og-
den's App., 70 Pa. 501; MacConnell v. Lindsay, supra; and
Kuntzleman's Est., 136 Pa. 142.

So, also, in Snyder's App., 92 Pa. 504, the testator made his
will in December, 1870, and died a few days thereafter. The
youngest daughter attained majority in August, 1878, which
was the time fixed for the division of his estate. At this time
one of the daughters was married and another betrothed; the
other daughters remained single, and it was conceded that the
will was inoperative to create any trust as to them. But, as
to the married daughter and the daughter then contemplating
marriage, it was contended the trust for their use then took
effect. It was held, however, that, as none of the daughters
were married or in contemplation of marriage at the creation
of the trust, the separate use fell. The fact that one of them
became covert or betrothed before the distribution of the estate
was of no effect; the validity of the trust must be determined
by the status of the woman at the time of the creation of the
trust. "This appears," said Mr. Justice STERRETT, "to be
the utmost limit to which this court has gone in favor of pri-
vate right as against public policy, and it would, perhaps, be
unwise to go any further. Trusts for coverture, either actual
or in contemplation at the time of their creation, have some
foundation in reason, which cannot apply to coverture in the
more remote future. In the former, the testator is presumed
to know the then existing or contemplated alliance, and has
the data on which to base an intelligent judgment as to the
propriety of creating a trust; whilst in the latter he can have
nothing more than a bare possibility as a guide." To the same
effect is the reasoning in Philadelphia Trust Co.'s App., 93
Pa. 209.

Whatever may be the rule in equity elsewhere, there can be
no question whatever as to the rule existing in this state. The
doctrine here is, undoubtedly, that a separate use can only be
created for the protection of a woman married or in immediate
contemplation of marriage, which, of course, implies marriage
with a particular person; for, how could a woman be said to be
in immediate contemplation of marriage if she was not at the
time contemplating marriage with some particular person?

Opinion of the Court.

The principles and policy which govern separate uses in Pennsylvania are so different from those prevailing in England that English authorities are inapplicable here, and the same may be said of authorities in many of the states.

The marriage must be in existence or in contemplation at the creation of the trust; and, although the trust does not take effect until the testator's death, it is very plain that it is created and exists under and by virtue of the will. For, as Lord MANSFIELD said, in Harwood v. Goodright, Cowp. 90: "A devise of lands is considered by our courts not so much in the nature of a testament as of a conveyance by way of appointment of particular lands to a particular devisee." Upon that principle it was established that a man could devise those lands only which he had at the time of such conveyance, and no after-acquired lands would pass; whereas a testament would operate upon whatever personal estate a man died possessed of, whether acquired before or after the execution of the instrument: Williams on Exrs., 6. In Girard v. Philadelphia, 2 Wall. Jr. 305, Judge GRIER said: "The reason why after-purchased lands do not pass by a will, even though the testator has expressed clearly his wish or intention that they should, is not because such a purchase is a revocation of the will, but because a will is in the nature of a conveyance or an appointment of a particular estate; and, consequently, the testator must have the power to dispose at the time the will is executed. Hence, a devise of land, though it operates in future, can pass only such interest or estate as the testator had at the time and continued to have till his decease." So, in our own case of Girard v. Philadelphia, 4 R. 335, it was held that real estate acquired after the making of a will did not pass under a devise of the residue of the testator's real estate, without a subsequent republication of the will, even where the testator, in addition to the general devise of the residue, declares in a codicil that it is his wish and intention that all the real estate which he shall thereafter purchase should pass by the same will. The ratio decidendi was stated in part as follows: "That a will is a species of conveyance, not strictly subject to the rules of conveyances at the common law it is true, the vesting of the estate being postponed till the death of the testator; yet operating, as regards his disposing power and capacity, by relation to the making of it, in

so much as to require his power over the estate to be perfect
at the time, just as his capacity must be perfect at the time ; it
being settled that the want of a disposing mind and memory at
the performance of the act of disposition, is not supplied by the
restoration of it before the death, for the same reason that an
intervening loss of it will not prejudice a disposition unexcep-
tionable at the time ; in other words, that the act of disposition
must be complete in every respect at the performance of it."

Of course, the matter decided has long since been changed
by the act of April 8, 1833, P. L. 250, and by the more recent
act of June 4, 1879, P. L. 88 ; but the reasoning of the case is
none the less applicable here on that account.   If a will is exe-
cuted in due form by a person of unsound mind, it will not be
received for probate because he was subsequently restored to
his right mind, and died without revoking it.   The question is
as to the testator's capacity at the time of execution.   Upon
the same principle, the legality of the execution of a will is to be
judged of by the law as it stood at the time of its execution:
Mullen v. McKelvy, 5 W. 399 ; Jack v. Shoenberger, 22 Pa.
416 ; Gable v. Daub, 40 Pa. 217 ; Camp v. Stark, 81* Pa. 235.
So, also, the power or right of a person to make a will is deter-
mined by the law as it existed when the will was made, not as
it was at the testator's decease : Kurtz v. Saylor, 20 Pa. 205.
In Martindale v. Warner, 15 Pa. 471, the will was made before
the act of May 6, 1844, P. L. 565, which provides against the
lapse of legacies in certain cases, but the testator died after its
passage.   The will gave the residuary estate to the testator's
two sons, who died before the testator, each leaving children.
In the opinion filed, the court said: " ' No devise or legacy
hereafter made,' is the phraseology of the act; thereby mean-
ing, according to the usual acceptation of language, wills made
and executed after the passage of the act.   If they had design-
ed otherwise, it would have been easy to express their mean-
ing in plain and unambiguous terms.   Though a will, it is true,
does not take effect till after the testator's death, yet it is in-
choate, though not consummate, from the execution of it; and
for many purposes in law, of which this is one, it relates to the
time of the making of it."   It was accordingly held that the
devise in favor of the residuary legatees lapsed.   " It is true
that every will is ambulatory until the death of the testator,

and a disposition made by it does not actually take effect until then.    General words apply to the property of which the testator died possessed, and he retains the power of revocation as long as he lives.    The act of bequeathing or devising, however, takes place when the will is executed, though to go into effect at a further time."    Upon this ground it was held in Taylor v. Mitchell, 57 Pa. 212, that, when a testator died in 1866, his will, executed in 1843, in the presence of a single subscribing witness, was sufficient to create a charitable use, notwithstanding the act of April 26, 1855, which requires two witnesses. To the same effect is Mullock v. Souder, 5 W. & S. 198.    A will speaks for some purposes from the period of its execution, and for other purposes from the death of the testator; yet it never operates until the latter period: Hitchcock v. Hitchcock, 35 Pa. 393; Williams on Exrs., 972, 973.    By the act of June 4, 1879, it is provided that "every will shall be construed, with reference to the real estate and personal estate comprised in it, to speak and take effect as if it had been executed immediately before the death of the testator, unless a contrary intention shall appear by the will."    It has also been held that, where a testator bequeathed a certain portion of the residue of his estate to his "legal and natural heirs," the distribution was referable to the intestate laws, and as there could be no heirs to the living, the rights of the distributees were, of course, to be determined by the law existing at the testator's death: Woods' App., 18 Pa. 478; Dubs v. Dubs, 31 Pa. 151.    But, as a general rule, the power or capacity of the testator to make the devises in question, the legality of the execution of the devises, and the nature and quantum of the estate are referable to the time and are determinative according to the law as it exists at the execution of the instrument.

In this state of the law, how was it possible that Neale's Appeal could have been determined otherwise than it was?    It was not pretended in that case that Elwina Finlay, at the time of the making of the will of James E. Brown, deceased, was either married or in immediate contemplation of marriage.    In fact she was but nine years of age, and did not marry for almost eight years thereafter.    The trust which was created by the will, was at the time of the execution of the will, either valid or invalid, and·her subsequent marriage in the lifetime of the tes-

tator could have no effect whatever to make it valid if before that it was invalid. The legality of the testator's disposition of his estate must be determined as of the date of the will, although it does not go into effect until his death. It is of no consequence that the cestui que trust was married in the lifetime of the testator. If he desired to validate the devise, which, presumably, he knew to be invalid, he could have done so by changing, re-executing, or republishing the will, and his failure to do that is conclusive upon us that he did not wish to do so. If it is believed that the law should be otherwise, the appeal should be to the legislature. The rules prevailing in this state in reference to separate uses have become rules of property. To change them by judicial decision would unsettle many titles, and do much injustice for which no remedy could be applied. We are of opinion that Neale's Appeal was rightly decided. The ruling in that case was simply the logical and inevitable conclusion to be drawn from the cases which preceded it; and, as Neale's Appeal in all respects governs the decision of the case at bar,

The decree of the Orphans' Court is affirmed, and the appeal dismissed at the cost of the appellant.